JOHNSON, LYTLE & CO. v. SPARTAN MILLS.

1. MANUFACTURING CORPORATION — EMPLOYEE — CHECKS.—A MONEY JUDGMENT cannot be obtained on a "check" redeemable in merchandise issued by a manufacturing corporation to its employees as a credit, but not in payment of labor.

2. CONSTITUTION.—Code 1902, secs. 2719 and 2720, are not violative of constitutional provisions as to equality of laws.

Before PURDY, J., Spartanburg, January, 1903. Affirmed.

Action by Johnson, Lytle & Co. against Spartan Mills. The decision on Circuit is as follows:

"The defendant is a corporation engaged in cotton manufacturing in Spartanburg County, in this State, and the plaintiffs are merchants in the same county.

"The plaintiffs commenced eight actions in the magistrate's court against the defendants, asking judgment for the sum stated in each complaint and aggregating about $716. As the same principle is involved in all of the cases and the same testimony will be applicable to all, it was agreed that the testimony taken in one case should answer for all the cases.

"The complaints in each case are similar, and each, in substance, is as follows: 'After setting out the copartnership of the plaintiffs, they allege that the defendant is indebted to the plaintiffs in the sum stated in each complaint, with interest from March 12th, 1902, for certain redeemable brass or metal checks held by and belonging to them and issued by the defendant, aggregating the amount stated in the complaint and which were presented to the defendant for pay-

ment on March 12th, 1902, a regular payday, and payment refused, in violation of an act of the General Assembly of this State, appearing at page 746 of the acts of 1901.'

"The defendant appeared and put in a general denial, and pleaded the unconstitutionality of the act referred to, alleging that it is in violation of both the State and Federal Constitutions.

"The magistrate gave judgment in each case in favor of the plaintiffs, and the defendant excepted upon the various grounds set out in his notice, which it is unnecessary to repeat in full, as the notice is in the record; but it may be said that some of the exceptions impute error to the magistrate in assuming that the checks were issued in payment for labor, and in not holding that the act was unconstitutional, in that it does not give all persons the equal protection of the law, does not apply to all laborers, and it takes property from a citizen without due process of law, and limits and interferes with the liberty of the citizen, in that it prevents him from freely and in his own way entering into contracts with others, when this liberty is allowed to all persons engaged in agricultural pursuits. That the magistrate erred in deciding that the plaintiffs were entitled to judgment in money equal to the amount of the checks; and erred in not holding that the plaintiffs, if entitled to judgment at all, could only recover the value of the checks, payable in merchandise and not in money; and erred in not holding that the plaintiffs could not sue the defendants at all, because the act fixes the penalty for its violation; and erred in holding that judgment could be obtained against the defendant for any sum other than for the penalty provided by the act. The act is entitled: 'An act to protect laborers in their wages, and to repeal inconsistent acts,' and the body of the act is found in the first volume of the Code of 1902, sections 2719 and 2720, as follows:

" 'Sec. 2719. It shall not be lawful for any corporation, person or firm in this State to issue, pay out or circulate for payment for the wages of labor, any order, check, memoran-

dum, token or evidence of indebtedness, payable in whole or in part otherwise than in lawful money of the United States, unless the same is negotiable in cash or in goods, wares or merchandise or supplies, at the option of the holder, at the store or other place of business of such firm, person or corporation, or at the store of any other person on whom such paper may be drawn, where goods, wares or merchandise are kept for sale, sold or exchanged; and the person who, or corporation, firm or company which, may issue any such order, check, memorandum, token or other evidence of indebtedness, shall, upon presentation and demand, within thirty days from date of delivery thereof, redeem the same in goods, wares, merchandise or supplies, or in lawful money of the United States, as may be demanded by the holder of any such order, memorandum, token or other evidence of indebtedness: *Provided,* That if said corporation, person or firm engaged as specified in this section have a regular pay day once in every thirty days, then said corporation, person or firm shall not be required to redeem such token or evidence of indebtedness in cash until the first pay day after the same becomes payable, as herein provided, and such token or evidence of indebtedness shall be presented for payment in cash only on such pay day: *Provided,* That the provisions of this section shall not apply to agricultural contracts or advances made for agricultural purposes.'

" 'Sec. 2720. Any officer or agent of any corporation, or any person, firm or company engaged in the business of manufacturing or mining in this State, who by themselves or agent shall issue or circulate in payment for wages of labor any order, check, memorandum, token or evidence of indebtedness, payable in whole or in part otherwise than in lawful money of the United States, without being negotiable and payable at the option of the holder in goods, wares, merchandise, supplies or lawful money of the United States, as required by section 2719, or who shall fail to redeem the same when presented for payment within thirty days from date or delivery thereof, by the said company or its agent at

his or their office or place of business, in lawful money of the United States, or who shall compel or attempt to coerce any employee of any such corporation, shall forfeit to the employee $50, to be recovered in Court of competent jurisdiction.'

"It should have been stated that the checks in question have on one side of them the statement that they are issued for the convenience of employees, and on the other side, that they are payable in merchandise at the Spartan Mills.

"The first question that presents itself under the exceptions, is whether any other person than the laborer or employee has a right to sue. The contention of the plaintiffs is that the word 'holder,' as used in the statute, refers to any person who may have the custody of the checks at the time they are presented for payment, while the defendant contends that the act, as shown by its terms and by its preamble, is intended solely for the protection of laborers. It is proper, and ofttimes necessary, to refer to the preamble of an act in order to assist in the construction of its terms, and upon referring to the preamble in this case, it is designated 'An act for the protection of laborers,' and the only thing in the act that points to any other conclusion is the use of the word 'holder' in the body of the act, which, taken by itself, will indicate that it had reference to the person who had possession of the check. When we take into consideration the preamble of the act, from which we gather its purport and purpose, and consider that, with the main body of the act and with the concluding clause of section 2720, we come to the conclusion that the terms 'holder,' 'laborer' and 'employee' are all used in the same sense, in fact, bear but a single meaning, and all point to the person who performs the labor. This is manifestly so, for the reason that the legislature can have no intention to protect outsiders dealing with the laborer, but its manifest intention was to protect the laborer dealing with his employer. But suppose that this should not be so; what rights would the holder of the check have? He would have clearly such rights as the statute

gave him, for when a statute undertakes to make a declaration concerning any subject, that is the whole on that subject. Here it has undertaken to say that 'It shall not be lawful for any corporation, person or firm in this State to issue, pay out or circulate for payment for the wages of labor, any order, check, memorandum, token or evidence of indebtedness, payable in whole or in part otherwise than in lawful money of the United States, unless the same is negotiable and redeemable at its face value, without discount, in cash or in goods, wares or merchandise or supplies at the option of the holder.' * * *

"While it makes the declaration that this shall not be done, yet, at the same time, it does not declare such contract to be void and not enforcible, nor does it provide that in the case of the failure to carry out the requirements of the act, the holder of the check, memorandum or token shall have the right to recover a judgment based upon such check, memorandum or token. Then whence does this right arise? The plaintiff in this case alleges that the defendant became 'indebted' to the plaintiffs for certain brass checks issued and redeemable under this act. Now, in order to become indebted to the plaintiffs, there must have been some contract, express or implied. There was no express contract on the part of the defendant to pay these checks in money, and there was no implied contract to pay them in money, because an implied contract of indebtedness could not be inferred from the nature of the check itself, which expressly says that the same shall be payable in merchandise, and there are none of the elements of an implied contract in the transaction, and, as stated, the statute does not give any right to the holder to bring an action against the defendant in case of his failure to pay in money.

"The act was designed to protect the laborer, by preventing the employer from issuing these tokens in payment for labor, and then coercing the laborer to take the same in merchandise instead of money, and it was not designed to enable such persons as might deal with the laborer to come in

and take the place of the laborer, and insist on a right not created in his favor.

"It will be noted in these cases, that the laborers themselves are not complaining, and there is no testimony whatever from any of them as to the manner of acquiring or parting with these checks.

"The magistrate, in his report, says that there was no question that these checks were issued in payment for labor, but that is not borne out from the testimony, for the statement of Mr. Montgomery, the treasurer of the mill, is as follows: 'Q. Mr. Montgomery, was any contract ever made between the mill and any of its employees, for the payment by the mill to its operatives for their labor in checks? A. No, sir. Q. So, then, you never issued the checks to any of the operatives of the mill in payment for their labor? A. No, sir. Q. I want to ask this, Mr. Montgomery, was it not true that these checks would frequently be issued before the labor was performed? A. Yes, sir, we issue checks to people before they ever go into the mill.' Mr. Montgomery then goes on to illustrate how the checks were issued and the books kept.

"If it should be conceded that the act in question is a valid exercise of the legislative power, and that its provisions will extend to the plaintiffs in this case, as to holders of the checks, then what rights would they have? The act itself says that it shall not be lawful to issue any check payable other than in the manner prescribed in the act, viz: other than in money or merchandise; but in this case the defendant has done what the act says it must not do—it has issued checks redeemable in merchandise, and the plaintiffs have purchased them and have paid for them in merchandise, and now they invoke the aid of the act to enable them to get payment in money. Since the defendant has violated the terms of the act and made a contract other than as provided for under its terms, the remedy of the holder (conceding at this point that the holder has any remedy) would be to present the checks and demand merchandise, and then, if his demand for

merchandise were refused, he might bring his action for damages, alleging his damages to be the value of the merchandise which was refused to be furnished.    But in this case, no such action can be brought, for the reason that the plaintiffs have prevented the defendant from carrying out the contract in this manner, by refusing to take the merchandise, and, as has been before stated herein, there is no penalty provided for this, other than that created in favor of the employee.

"But the greatest stress is laid upon the exception that the statute is unconstitutional, in that it violates the provisions both of the State and Federal Constitutions.    The provisions of these Constitutions are practically identical, and their terms are so well known that they need not be repeated.    Our Supreme Court has recently passed upon this question in a full, clear and elaborate manner, in the case of *Porter* against *the Railroad Company,* 63 S. C., page 169, and one of the latest, if not the latest, decisions on the subject by the United States Supreme Court is the case of *Connelly* against *Union Sewer Pipe Co.,* and our own Court is thoroughly in accord with the principles laid down in this case.

"In *Connelly* against *the Union Sewer Pipe Co.,* decided March 10th, 1903, the Court says: 'What may be regarded as a denial of the equal protection of the laws is a question not always easily determined, as the decisions of this Court and of the highest Courts of the States will show.    It is sometimes difficult to show that a State enactment, having its source in a power not controverted, infringes rights protected by the national Constitution.    No rule can be formulated that will cover every case.    But upon this general question we have said that the guaranty of the equal protection of the laws means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes, in the same place and under like circumstances. * * * The fourteenth amendment, in declaring that "no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of

the laws," undoubtedly intended, not only that there should be no arbitrary deprivation of life or of liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances, in the enjoyment of their personal and civil rights. That all persons should be equally entitled to pursue their happiness and acquire and enjoy property.' * * * And it also states that 'The equal protection of the laws is a pledge of the protection of equal laws;' and further: 'The 14th amendment required that all persons subject to legislation limited as to the objects to which it is directed, or by the territory within which it is to operate, shall be treated alike, under like circumstances .and conditions, both in the privileges conferred and in the liabilities imposed.' 'Due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government.' And again: 'All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the State legislature or the people of the State in framing their Constitution.' And again, in reference to classification, the Court says: 'The difficulty is not met by saying that, generally speaking, the State when enacting laws may, in its discretion, make a classification of persons, firms, corporations and associations, in order to subserve public objects.' For this Court has held that classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without such basis. * * * But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the 14th amendment forbids this. * * * No duty rests more imperatively upon the Courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. * * * It is apparent that the mere fact of classification is not sufficient to relieve a statute from the

reach of the equality clause of the 14th amendment, and that, in all cases, it must appear, not only that a classification has been made, but also that it is one based upon some reasonable ground, some difference which bears a just and proper rela-' tion to the attempted classification, and is not a mere arbitrary selection.'

"If we add to the foregoing the well known principle that everything must be taken in favor of the constitutionality of an act; that it will not be declared to be unconstitutional except it be shown to be clearly in violation of some constitutional provision, either State or Federal, we have before us the principles upon which the validity of the act in question must be determined.   In declaring that the provisions of this act shall not apply to agricultural contracts or advances made for agricultural purposes, and in providing a penalty against the officers or agents or any corporation, or any person, firm or company engaged in the business of manufacturing or mining in this State, is the act simply classifying in a proper manner those persons or subjects, and operating upon them properly, as a class, or has it made an arbitrary selection in reference to them and in excluding all others?   There should be some reason for excluding agricultural contracts or advances made for agricultural purposes from the provisions of the act, and there should be some reason for subjecting officers, agents, persons, firms, companies and corporations engaged in manufacturing and mining to the penalty prescribed by the act.

"What reason can be given for this?   A man, with the members of his family, might go, in the early part of the year, to work on a farm as farm laborers, and the farmer would be permitted, if he thought proper to do so, to hand out to this man and his family checks or other tokens of indebtedness for labor, and after they were received, the persons receiving them or the persons who might trade for them, would be compelled to take them in merchandise; while, on the other hand, the same person, with the members of his family, after the crop is made and carried to the Spar-

tan Mills, for instance, the defendant here, and sold to it, could enter into the employment of the defendant, undertaking to labor, and if they saw fit to take checks as a matter of accommodation from which to obtain credit at the store of the defendant, or in payment for labor, they could, on any pay day, come and change their contract and demand payment in money. The same avenue is open to the farmer who employed them in the summer time, to obtain the money through the great commercial arteries of the country, and settle with them at stated periods, as is open to the defendant. Then why protect one and deny the equal protection of the laws to the other? Where is the reason for it? Can it be said that the defendant has better facilities for obtaining money? Is more wealthy than the farmer who employs labor? If this be so, it can be answered that one farmer may have two or three times as much as his next door neighbor, who is also a farmer, and that as long as there is a difference in temperament and intellect, some men will be poor and others rich—and yet the law knows no difference, it operates on rich and poor alike.

"It is contended by the defendant that not only does the act in question operate unequally upon persons in the same class, similarly situated, but that it denies the same rights and privileges granted to others, in that it allows certain persons and classes of persons similarly situated to make any kind of contracts that they may think proper, and denies this right to others. As a general proposition, all persons who are capable of consent, can enter into a contract based upon a real consideration, touching a legal subject matter, and the Courts will enforce contracts which have these elements, and will not undertake to make contracts between the parties. The act in question prohibits issuing, paying or circulating for payment for the wages of labor, any order, check, memorandum or token, unless the same be redeemable in cash, goods, wares or merchandise, but excludes from its operations the persons named, and imposes a penalty upon some of those who violate its terms, and does not subject

others, although they may be similarly situated, to the same penalty. In reference to corporations generally, it would be perfectly competent for the legislature to declare certain restrictions concerning the management and government of the corporation, because the corporation being the creation of the legislature, is subject to its control, but it would have to make an enactment that would operate upon all corporations of a similar class in like manner. Here manufacturing and mining corporations have been arbitrarily selected and made the subject of a penalty for doing an act which other corporations similarly situated may do with impunity. The act prevents persons from selling any article or property and taking payment in labor, and prevents laborers from acquiring property by their labor, if one of them should see fit to contract to sell his property for labor and the other to receive property in payment for labor.

"If the act in question be allowed to stand, then no person in this State could enforce any contract for the sale of any property or article with any laborer, other than an agricultural laborer or a laborer taking agricultural advances; for no matter what may be the form of the evidence of indebtedness, no matter whether the laborer has agreed to take payment in land, houses, cattle or merchandise, he can repudiate his contract at pleasure, and come up and say that he must be paid in money, which is a direct contravention of the Constitution of the United States, which declares that no law shall be passed to impair the obligation of a contract, and directly interferes with the liberty of the citizen in acquiring and disposing of property. And, in this view of the case, the act would be unconstitutional, even without the exemptions; but with the exemptions and the imposition of the penalty on certain persons, firms and corporations, it is clearly unconstitutional.

"Take, for instance, another result, if this act be allowed to stand. Under the act in relation to business corporations in this State, suppose that the defendant here should decide to issue an increase of its capital stock, and a large number of

shares were thrown on the market, and having, as it has, a large number of employees, it desired to encourage these employees to take stock and become interested in the workings of the mill, and that those employees had no other means of paying for their stock than by their labor, the statutes provide that such subscriptions may be paid in money, property or labor. And suppose that the employees enter their subscriptions payable in labor, and that at the end of each month—until the price of the subscription has been worked out in labor—the officers of the corporation should give to such laborer a memorandum stating, "This certifies that A. B., the holder thereof, is entitled to $10 for labor performed, payable only in subscription to the capital stock of the Spartan Mills, in accordance with the terms of its subscription.' Here the laborer has performed labor for a corporation. Here is a memorandum or token issued in payment for labor, and if the construction of the act contended for be given to it, the laborer could come and on any pay day violate the terms of his subscription, and demand and compel the defendant to pay in money, instead of giving him stock for his subscription.

"According to the views that we entertain of the statute, and of the law applicable thereto, the plaintiffs herein could have no right, as a holder of the checks, to a 'money judgment.' The act was not intended for their protection, and their remedy—if they had any remedy at all—was simply to receive the goods; and, having been offered the goods, they have no right to sue in this case.

"And further: The act in question is unconstitutional, in that it violates both the terms of our own Constitution and of the Constitution of the United States, in abridging the liberty of the citizen to contract and be contracted with, to acquire and enjoy his property; it impairs the obligations of contracts and denies the equal protection of the laws to the citizens of our State.

"It is, therefore, ordered, adjudged and decreed, that the

exceptions be sustained, and the complaints in each of the said cases be, and they are hereby, dismissed with costs."

From this judgment, the plaintiffs appeal on the following exceptions:

"1. That his Honor erred in holding that the terms 'holder,' 'laborer' and 'employee,' in the act entitled 'An act to protect laborers in their wages and to repeal inconsistent acts,' incorporated as sections 2719 and 2720 of the Code of 1902, are all used in the same case with but a single meaning, to wit: the person who performs the labor. The error being that there is nothing in the act to point to such conclusions, or to indicate that any other meaning was intended to attach to 'holder' than its usual and ordinary one, to wit: the person holding the checks.

"2. That his Honor erred in holding that the act does not provide that in case of failure by the employer to carry out the requirements thereof, the holder of the check shall have the right to recover a judgment based upon such check. The error being that the act specifically provides that the holder, whoever he may be, shall have the right to demand, and that it shall be the duty of the employer to pay, such check in money; thereby enacting a cause of action in favor of the holder against the employer upon such right of the holder and such violated duty of the employer.

"3. That his Honor erred in holding that the magistrate's finding that there was no question that the checks were issued in payment for labor, is not borne out by the testimony. The error being that his Honor only considered a part of Mr. Montgomery's testimony and not the whole of it; and his testimony conclusively showing that the labor of the employee bought and paid for the checks and that the checks bought and paid for the labor; it making no difference whether the checks were delivered in advance of the labor rendered or subsequent thereto; the agreement of the parties being that the checks were to be paid for by labor, or *vice versa;* there being an interchange of labor for checks, or checks for labor.

"4. That his Honor erred in holding that the plaintiffs cannot recover, for the reasons that the defendant violated the act in issuing checks redeemable in merchandise only; the remedy of the plaintiffs being, if they have a remedy, to present the checks and demand merchandise and upon demand being refused, to bring their action for damages in the amount of the value of the merchandise; but that in these cases no such action could be brought because that plaintiffs prevented the defendant from carrying out the merchandise contract by refusing to accept the merchandise. The error being, it is respectfully submitted, that such holding is argument in circle, and bases the defendant's non-liability to plaintiffs solely upon the defendant's violation of the right of plaintiffs under the statute to require the labor to be paid for in money; and that his Honor's conclusion is in direct conflict with the terms of the statute.

"5. That his Honor erred in holding that the said act is unconstitutional for the reasons stated by him, because in violation of the United States Constitution and the Constitution of South Carolina, in abridging the liberty of the citizen to contract and be contracted with, and to acquire and enjoy his property. The error being that the reasons stated by his Honor for such position are not sustained by the act and do not lead to the conclusion reached by him.

"6. That his Honor erred in holding that the act in question is unconstitutional, because impairing the obligation of contracts, and denying the equal protection of laws to citizens of the State. The error being that the reasons stated by his Honor for such conclusions are not sustained by the act in question, and do not lead to the conclusions reached by him. The exception of agricultural contracts and advances made for agricultural purposes does not render the act unconstitutional, because such exception rests upon a difference bearing a reasonable and just relation to the act and not made arbitrarily; the said act accords to every person or class of persons the same protection of law that is enjoyed by other persons or classes under like circumstances. Farm laborers

occupy a peculiar relation to their employers, and, to a large
extent, are dependent upon the output of a farm for their
remuneration; in a majority of instances, they receive their
pay at the end of the year in part of the crops and not in
money; they have a lien upon the crops made by them for
their wages by statute. Farm laborers' products are not
sold as fast as made, as in cases of other laborers, and are not
reduced to cash. To require payment of farm labor in cash
and not by credit, would necessitate a revolution in the
methods of farming in the State; and at the time of the
passage of said act, there was already in force in this State
an act prohibiting the issue of plantation checks, designed
for the protection of this special class of labor, which act is
incorporated in vol. 2 of the Code of 1902, as section 358;
and plantation laborers being further protected in their con-
tracts by sections 2715 and 2716 of vol. 1 of said Code."

*Mr. Stanyarne Wilson,* for appellant, cites: *As to the con-
stitutionality of the act:* Code, 1902, secs. 2715-2717; Crim.
Code, 358; 184 U. S., 544; 165 U. S., 24; 134 U. S., 238;
142 U. S., 354; 120 U. S., 68; 128 U. S., 578; 63 S. C., 178.

*Mr. C. P. Sanders, contra,* cites: *As to the constitutionality
of the act:* 184 U. S., 544; *Utsey* v. *Hiott,* 30 S. C.; 43
Am. St. R., 670; 155 Mass., 117; 37 Am. St. R., 206; 46 Id.,
315; 50 Id., 443; 81 Id., 642; 25 Id., 864; 4 Id., 468; 111
U. S., 755; 1 Abb., 398; 95 U. S., 113; 113 Pa. St., 431; 57
Am. R., 869; 50 Id., 636; 21 L. R. A., 789; 84 Am. St. R.,
818; 82 Id., 605; 83 Id., 116; 80 Id., 176; 2 Bail., 334; 53
S. C., 455; End. on Int. of Stat., secs. 59, 459; 23 Ency.,
321; Sedg. on Con. Stat. L., 76, 77; Suth. on Stat. Con., sec.
241.

March 28, 1904. The opinion of the Court was deliv-
ered by

MR. JUSTICE JONES. We affirm the judgment of the Cir-
cuit Court upon this ground. The Circuit Court has found

23—68

as matter of fact that the testimony does not bear out the conclusion of the magistrate that the checks in question were issued in payment for labor. This being an appeal in a case at law, the finding of the Circuit Court on a question of fact is not reviewable. We do not think that it can be said that the only inference from the testimony is that the checks were issued in payment for wages of labor. One of the plaintiffs, Mr. Lytle, testified that when he demanded payment of the checks in cash from the assistant treasurer of the mills, he said he would redeem them in goods but not in cash; that he did not issue them for labor, but that they were issued for the convenience of the operatives and the store. The assistant treasurer, Mr. Montgomery, testified that the checks were sold to the operatives and a charge made of them against the operatives on the store books of the company as merchandise checks; that on the regular pay days, which were the 12th and 27th of each month, the operatives would be paid for their labor the balance due after deducting the store account; that no contract was ever made between the mill and any of its employees for the payment of their labor in checks; that no checks were ever issued to any operative in payment for his labor; that checks were frequently issued before any labor was performed; that it was optional with the employees to buy checks or coupon books, or have merchandise charged. This was the substance of the testimony on this point, and it cannot be said that the Circuit Court committed *error of law* in holding upon the testimony that the checks were not issued in payment of labor. Since the undisputed testimony was that these metal checks were redeemable on their face only in merchandise at the store of the defendant, and that defendant offered and stood ready to redeem them in merchandise and plaintiff refused to accept same, plaintiff cannot recover in this action. Plaintiffs claim the right to recover because of the statute cited, but have failed to bring themselves within the terms of the statute as the holder of checks issued in payment for labor. Under this view, it is immaterial to the disposition

of this case whether the act in question is constitutional or not; and defendant is not in a position to assail the constitutionality of the act, since the record does not show a case arising under the act.

Inasmuch, however, as the Circuit Court has declared secs. 2719 and 2720, Civil Code, unconstitutional, and the matter has been strenuously argued before us, and an expression of our view is deemed important, we will not withhold consideration of the question. The view of the Circuit Court is presented in the Circuit decree, which, with the exceptions thereto, is herewith reported.

In the first place, as this is not an action to recover any penalty imposed under sec. 2720, quoted in the decree of the Circuit Court, a consideration of such section is not involved. The plaintiffs' action is based solely upon sec. 2719, and our consideration should be confined to that. As to that section, it is contended that the proviso, "that the provisions of this section does not apply to agricultural contracts or advances made for agricultural purposes," renders the act unconstitutional. The authority mainly relied on to sustain this view, *Connolly* v. *Union Sewer Pipe Co.,* 22 Sup. Ct. Rep., 431, does not appear to us to be at all conclusive. Under the Illinois Trust Act, condemned in that case, all, except producers of agricultural commodities and raisers of live stock, who combine their capital, skill or acts for any of the purposes named in the act, to destroy competition and control prices, may be punished as criminals, while agriculturalists and live stock raisers, in respect of their products or live stock in hand, are exempted from the operation of the statute, and may combine and do that which, if done by others, would be a crime against the State.

As was stated by this Court in *Simmons* v. *Telegraph Company,* 63 S. C., 430, 41 S. E., 521, "Legislation is not unequal or discriminatory, in the sense of the equality clause of the Constitution, merely because it is special or limited to a particular class. The decisions of the United States Supreme Court establish that the legislature has power to make

a classification of persons or property for public purposes, provided such classification is not arbitrary and bears reasonable relation to the purpose to be effectuated, and that the equality clause is not violated when all within the designated class are treated alike.    In the case of *Barbier* v. *Connolly,* 113 U. S., 27, 5 Sup. Ct. Rep., 537, the Court said: 'Class legislation, discriminating against some and favoring others, is prohibited, but legislation which in carrying out a public purpose is limited in its operation, if within the sphere of its operation it affects alike all persons similarly situated, is not within the (14th) amendment * * * Neither the amendment, broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order, and to legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity.'    In *Soon Hing* v. *Crowley,* 113 U. S., 703, 5 Sup. Ct. Rep., 730, the Court said: 'The specific regulations for one kind of business, which may be necessary for the protection of the public, can never be a just ground of complaint, because like restrictions are not imposed upon the business of a different kind.    The discriminations, which are open to objection, are those where persons engaged in the same business are subjected to different restrictions or are held entitled to different privileges under the same conditions.'    In the case of *Railway* v. *Mackey,* 127 U. S., 205, 8 Sup. Ct. Rep., 1161, the Court affirmed the constitutionality of a Kansas statute imposing upon railroad corporations future liabilities for damages to employees by negligence of their fellow-servants, notwithstanding no such liability existed against any other person or corporation, because the Court considered that the legislation met a particular necessity, and all railroad corporations without distinction were made subject to the same liability."

In the case of *St. Louis etc. Ry. Co.* v. *Matthews,* 165 U. S., 1, 17 Sup. Ct. Rep., 241, which accords with *McChand-*

*lers* v. *R. R. Co.,* 38 S. C., 116, it was held that a statute, making railroad companies liable for property destroyed by fire communicated from their locomotives, did not violate the 14th amendment, even though the liability did not depend on any negligence of the railroad company. Let it be noticed that in the two last named cases, the classification for the imposition of special liability was not affected by the fact that there were other common carriers operating with steam, which might communicate fire, or whose employees might sustain injuries through the negligence of their fellow-servants; thus showing that a classification need not include all engaged in a general business, as the business of carrying freight and passengers, but may simply embrace a more limited class, who carry freight and passengers in a particular way, or by particular instrumentalities.

So, in the case of *Holden* v. *Hardy,* 169 U. S., 366, 18 Sup. Ct. Rep., 383, the Court sustained as not violative of the 14th amendment, a Utah statute forbidding the employment of workingmen for more than eight hours per day in mines and in the smelting reduction, or refining of ores or metals, although, no doubt, it would be easy to point out in Utah other occupations, wherein it might be proper and advisable to prescribe limitations of the hours of labor. It is no fatal objection to a classification that it is not perfect, that it is unwise, that it is inexpedient. To be obnoxious to the 14th amendment, the classification must be manifestly unreasonable, without basis or any reasonable difference or distinction among the objects of classification, with respect to the purpose of classification, must be arbitrary. The solution of this question in many cases is confessedly difficult and delicate, and it must always be borne in mind, as a vital principle, that a statute should not be declared unconstitutional unless it is a clear, unmistakable violation of the fundamental law.

In the case of *Otis* v. *Parker,* 187 U. S., 606, 23 Sup. Ct. Rep., 169, the Court held that the California Constitution, art. IV., sec. 26, avoiding the contracts for the sale of shares

of corporate stock on margin, did not violate the equal pro-
tection of the law, because the provision strikes only at some
and not all objects of possible speculation.  In delivering
the opinion of the Court in that case, Mr. Justice Holmes
uses these wise and appropriate words: "While the Courts
must exercise a judgment of their own, it by no means is
true that every law is void which may seem to the judges
who pass upon it excessive, unsuited to its ostensible end, or
based upon conceptions of morality with which they disa-
gree.  Considerable latitude must be allowed for difference
of view as well as for possible peculiar conditions which this
Court can know but imperfectly, if at all.  Otherwise, a con-
stitution, instead of embodying only relatively fundamental
rules of right, as generally understood by all English-speak-
ing communities, would become the partisan of a particular
set of ethical or economical opinions, which by no means are
held *semper ubique et ab omnibus.*"

The meaning of the proviso to sec. 2719, as I suppose, is
that the provisions of the section shall not apply to agricul-
tural *labor* contracts, or advances for agricultural purposes
made to laborers.  I think there are substantial reasons why
the legislature deemed it proper to insert the proviso.  In
the first place, a previous statute, sec. 358, Crim. Code, had
already made provisions for the protection of farm laborers.
That statute provides: "Any person or persons who shall
offer to any laborer or employee at the time when the wages
of such laborer or employee are due and payable by agree-
ment, unless otherwise provided for by special contract, as
compensation for labor or services performed, checks or
scripts of any description, known as plantation checks, pay-
able at some future time, or in the shops or stores of em-
ployers, in lieu of lawful money, shall be liable to indictment
and punishment by a fine not exceeding $200, or by imprison-
ment not exceeding one year or both, according to the discre-
tion of the Court: *Provided,* The word 'checks' herein shall
not be construed so as to prohibit the giving of checks upon
any of the authorized banks of deposit or issue in this State."

So, also, provision for the protection of farm laborers are made in other statutes, as in sections 2715, 2717, vol. 1, Code. The object of both statutes quoted construed together is to protect *all* laborers from coercion by employers to compel laborers to receive, as wages for labor, goods, wares or merchandise or supplies in lieu of lawful money. It is true, there is a distinction between the two statutes in this: that persons or corporations engaged in manufacturing or mining may incur a penalty for refusing to redeem checks issued in payment of wages, in lawful money, even though the laborer may possibly have contracted to receive his wages in whole or in part in goods, &c.; whereas, persons engaged in agriculture incur no penalty for paying, or offering to pay, the wages of farm laborers in goods, &c., provided a special contract with the laborer authorizes payment of wages in that way. But this distinction is reasonably based upon differences in the general conditions surrounding farm labor as a class and manufacturing and mining laborers as a class.

The testimony shows that no contract between the manufacturer in this case and the laborer was made by which the laborers were to receive their wages in goods or merchandise checks, and I venture to say that it is rarely, if ever, the case for manufacturing or mining establishments to contract to pay wages otherwise than in money. But, from the nature of the business and the large number of employees, it is no doubt necessary to have regular pay days at reasonable intervals, usually twice per month, as in the case of defendant mill. Naturally, many operatives, by reason of their necessities, would frequently want means of providing for themselves and families before the arrival of pay day, hence arose the practice of issuing checks, or coupon books, or some form of credit, by which the operatives could secure supplies in advance of pay day, said checks or coupons being in certain denominations, and redeemable at the mill store in merchandise. Here arose an opportunity for apprehension in enabling an unscrupulous employer to take advantage of the necessities of the laborer, and demand extortionate prices

for the merchandise. The statute seeks to remove this inequality between the employer and employee by making such checks, &c., negotiable and redeemable in cash under specified conditions and at stated times. Such legislation was undoubtedly intended to meet what was regarded an evil particularly affecting laborers in mills and mines, for which no remedy had been devised, as in the case of farm laborers. Farm laborers having previously been classified for purposes of legislation in their protection, and there being no suggestion that such classification was unreasonable, it could hardly be said that legislation designed to protect other laborers is void for unreasonableness, merely because a distinct class already provided for is excluded from the statute. A very different situation was presented to the Court in *Connolly* v. *Union Sewer Pipe Co., supra.* It must be remembered that every classification, in the nature of things, involves some inequality as between a member of one class and a member of another class, for otherwise there would be no such thing as classification. But in law there is no inequality, if the members of a class, reasonably designated, are given the same rights or made subject to the same restrictions. Hence, it is no objection to this legislation, in so far as equal protection of the law is involved, to point out that sections 2719 and 2720 interfere to some extent with the right of mill owners and their operatives to contract that labor shall be paid otherwise than in lawful money; whereas, sec. 358, as to farm laborers, does not interfere with the right of land owners and farm laborers to make such contract. The right of contract is not absolute, and is subject to the police power of the State. Of course, the right of contract cannot be arbitrarily interfered with.

In *Holden* v. *Hardy,* 169 U. S., 366, a statute fixing the period of employment in underground mines at eight hours per day, was held as not to unlawfully restrict the right of employer and employee to contract for a longer period per day.

In *Orient Ins. Co.* v. *Daggs,* 172 U. S., 557, where a con-

tract of insurance provided for liability not exceeding the cash value of the property at the time of loss, and where a Missouri statute provided that the insurance company should not be permitted to deny that the property was worth the full amount insured at the time of the insurance, and in case of total loss the measure of damages shall be the amount for which the property was insured, less depreciation in value since insurance, the Court held that the statute was within the police power of the State, even though it placed a limitation upon the right of contract.

In *Otis* v. *Parker,* cited *supra,* the Court held that the California Constitution avoiding all contracts for sales of shares of corporate stock on margin, and providing for recovery of money paid on such contracts, did not unconstitutionally interfere with the right of contract, although this provision may be construed to apply to *bona fide* as well as gambling contracts.   See, also, *Avent Beattywith Coal Co.* v. *Kentucky,* 28 L. R. A., 276 ; *Hancock* v. *Yaden,* 121 Ind., 366, showing that similar legislation does not unlawfully interfere with the right of contract. · If we admit that placing farm labor contracts into one class and mill and mine labor contracts in another class, is a reasonable classification so as not to violate the principle of equality, then the case of *Knoxville Iron Co.* v. *Harbison,* 183 U. S., 13, 22 Sup. Ct. Rep., 1, is conclusive that legislation of the kind in question does not unlawfully interfere with the right of contract.

This brings us back to the real question as to whether the two statutes, which, construed together, embrace all labor contracts, constitute an arbitrary classification.   The two systems of labor engaged in farming on the one hand and manufacturing on the other, and the conditions surrounding each, are distinct in many ways.   The large number of mill operatives, aggregated into communities, as contrasted with the few laborers in the employ of the average farmer and scattered throughout the country ; the daily output of the mills, as contrasted with the yearly product of the farm ; the resources of aggregated wealth to command ready cash, com-

pared with the ability to pay always in cash of the average farmer dependent for his cash upon crops once a year; the consequent ease with which manufacturers may carry out a system, involving regular pay days in cash at brief intervals throughout the year, as contrasted with the difficulties in the way of the farmer to comply with such a system; the rarity of contracts to pay mill laborers in anything but money; the prevalence of farm labor contracts involving payment of wages in supplies or farm products; are some of the considerations which would make it reasonable to have some differences in the regulations made for the protection of the respective classes of labor. It is well known that many agriculturists contract to pay a portion of the wages of labor in supplies obtained through orders upon merchants. A very prevalent system of farming exists in this State, under which the farm laborer agrees to receive a share of the crops grown or cultivated by him as compensation for his labor, but in the meantime, until the crops are gathered and divided, the landowner undertakes to make advances in supplies to be deducted from the laborer's share of the crop. The necessities of the average farmer often compel him to make arrangements with some merchant to fill his orders for supplies to such laborers. Now, but for the proviso in section 2719, all orders for supplies, which could be construed to be in payment for labor issued by landowners to farm laborers under these circumstances, would be redeemable in cash in the hands and at the option of the laborer, if presented for redemption, as required by the statute, notwithstanding the laborer's contract to the contrary, although such contract is a part of a prevalent system advantageous to both landowner and laborers. To place orders of landowners, made under such circumstances, in the category of merchandise checks, &c., redeemable in cash, as prescribed in the statute, would very seriously affect the system of labor contracts on farms. Hence the proviso. We hold, therefore, that the statute in question is not unconstitutional.

The judgment of the Circuit Court is affirmed.