6726

## EX PARTE HOLLMAN.

1. CONSTITUTIONAL LAW—HABEAS CORPUS.—The constitutionality of a statute may be tested under a writ of *habeas corpus*.
2. IBID.—AGRICULTURAL LABORERS.—SECTION 357 OF CRIMINAL CODE, providing that a laborer may be convicted and punished for violation of an agricultural contract after receiving advances from the landowner, is invalid because opposed to Sec. 24 of Art. I of the Constitution of this State, to the thirteenth amendment to the Constitution of the United States and Sec. 1990 of Revised Statutes

of United States of 1901, passed in pursuance thereof, known as the peonage statute, and to Sec. 5, Art. I of the Constitution of this State.

*State* v. *Williams*, 32 S. C., 124; *State* v. *Chapman*, 56 S. C., 420; *State* v. *Easterlin*, 61 S. C., 71, *not followed*.

Petition in this Court in its orginal jurisdiction by Jack Hollman for writ of *habeas corpus*.

The cause was first argued at the April term, 1907, but during the November term, 1907, was ordered reargued before Court *en banc* January 16, 1908.

*Messrs. Herbert & Benet,* for petitioners. Oral argument.

*Attorney General J. Fraser Lyon* and *Wm. Henry Parker,* contra. *Mr. Parker* cites: *As to jurisdiction:* 9 S. C., 80; 15 Ency., 204, 205; 32 S. C., 583, 123; 5 S. C., 71; 3 Pet., 206; 1 Pet., 340. *As to the constitutionality of the Act:* 32 S. C., 123; 56 S. C., 420; 61 S. C., 71; Con., art. I, sec. 24; 16 Ency., 22-25; 45 Am. Dec., 396; 77 N. C., 329; 37 Am. St. R., 738; 3 T. R., 98; Tied. Lim. Police Power, 178; 47 S. E. R., 958; 52 S. E., 74, 293; 118 U. S., 356; 37 S. R., 334; 127 U. S., 685; 165 U. S., 275; 123 Fed., 685; 63 Fed., 317, 319; 169 U. S., 366; 5 Am. St. R., 332; 152 U. S., 133; 113 U. S., 27; 123 U. S., 632.

January 16, 1908. The opinion of the Court was delivered by            /

MR. JUSTICE WOODS. Under *habeas corpus* proceedings, Jack Hollman has applied to this Court for release from imprisonment, alleging the statute under which he was convicted and sentenced to be unconstitutional. The position that the unconstitutionality of a statute cannot be tested under a writ of *habeas corpus* is maintained by some courts of high authority, but is opposed to the weight of reason and precedent. There is no

difference of opinion that a writ of error or the statutory appeal cannot be supplanted in criminal procedure by resort to the writ of *habeas corpus* for correction of mere errors of law. But the distinction is that the courts are bound to treat unconstitutional enactments as void in whatever proceedings they may be encountered. An unconstitutional statute, though having the form and name of law, is in reality no law, and the courts must liberate one suffering imprisonment under it just as if there had never been the form of a trial, conviction and sentence. The office of the writ of *habeas corpus* is to liberate those who are imprisoned without authority of law. While the point was not discussed, this must have been the view of the Court in *State* v. *Higgins,* 51 S. C., 51, 28 S. E., 51; 38 L. R. A., 865; and *Ex parte Keeler,* 45 S. C., 537, 23 S. E., 865; 31 L. R. A., 678; for the Court considered under *habeas corpus* the constitutionality of the statutes under which the petitioners were held, and rested its decision in both cases on the determination of that question. This is the view of the Supreme Court of the United States. *Ex parte Siebold,* 100 U. S., 371; *Dimmick* v. *Tomkins,* 194 U. S., 540. The numerous other authorities to the same effect will be found collated in 87 Am. St. Rep., 175; 39 L. R. A., 449; 21 Cyc., 302; 15 A. & Enc., 169. We proceed, therefore, to consider the constitutionality of the statute to determine whether the petitioner should be released.

Section 357 of the Criminal Code, the statute under which the petitioner was convicted and which is here attacked, is as follows: "Any laborer working on shares of crop or for wages in money or other valuable consideration under a verbal or written contract to labor on farm lands, who shall receive advances either in money or supplies and thereafter wilfully and without just cause fail to perform the reasonable service required of him by the terms of the said contract shall be liable to prosecution for a misdemeanor, and on conviction shall be

punished by imprisonment for not less that twenty days nor more than thirty days, or to be fined in the sum of not more than twenty-five dollars nor more than one hundred dollars, in the discretion of the Court: *Provided,* The verbal contract herein referred to shall be witnessed by at least two disinterested witnesses."

The first question is whether this statute violates Sec. 24, Art. I of the State Constitution, which provides: "No person shall be imprisoned for debt except in cases of fraud." The act refers exclusively to a farm laborer working for a consideration under a contract, who (1) "shall receive advances in money or supplies and (2) thereafter wilfully and without just cause fail to perform the reasonable service required of him by the terms of the said contract." It will be observed the statute does not require for the completion of the crime, proof of the making of the contract and the obtaining of the advances on the faith of it with the intention formed at the time not to perform the service. Such action as that on the part of the laborer would be fraudulent, and a statute providing for its punishment would not violate a constitutional provision allowing imprisonment for debt in cases of fraud. But the act under consideration provides imprisonment as a punishment for conduct after the contract has been made and the work begun, and the important inquiries are, first, is the conduct so made criminal, a failure to pay a debt; and, second, is such conduct consistent with good faith, with entire absence of fraud. If these inquiries are to be answered in the affirmative, then it follows the acts should be declared unconstitutional as providing for imprisonment for debt without proof of fraud.

The case of *State* v. *Brewer,* 38 S. C., 263, 16 S. E. R., 1001, 19 L. R. A., 362, holding constitutional the statute authorizing the imprisonment of one convicted of bastardy who fails to give the bond required by law, has no application, for the Court expressly held the penalty not to be a debt but a punishment for the crime of bastardy. If,

however, we follow the cases *State* v. *Williams,* 32 S. C., 124, 10 S. E., 876; *State* v. *Chapman,* 56 S. C., 420, 34 S. E., 961; *State* v. *Easterlin,* 61 S. C., 71, 39 S. E., 250, then this act must be upheld. In the first case such legislation was held constitutional, the Court saying: "If the General Assembly sees proper to make the violation of a particular species of civil contracts a criminal offense, we are unable to discover in the provisions of the Constitution anything that forbids such legislation." In *State* v. *Chapman* this very statute was sustained against the charge that it was discriminatory in favor of the landlord and against the laborer, but no reference is made to the question of imprisonment for debt. In *State* v. *Easterlin,* the statute was held not to provide imprisonment for debt, and the Court said: "Even if it could be so construed, the offense made punishable involves an element of fraud." Nothing short of strongest conviction of fundamental error should induce the Court to essay a review of the conclusions embodied in these cases. We shall not discuss at length the doctrine of *stare decisis.* It seems obvious it has less force when the constitutional rights of the citizen to his personal liberty is involved, than in those cases involving the fixedness of property rights and the regularity of procedure. With the profoundest respect for the Judges who delivered and concurred in these opinions, we cannot avoid the conclusion that the statute in question provides for imprisonment for debt without proof of fraud, and, therefore, attempts to deprive the citizen of one of the personal rights guaranteed by the Constitution of the State.

The mere receipt of money or supplies advanced by the employer cannot make the laborer anything more than a debtor to the employer; and without doubt the repayment of the money or the value of the supplies advanced puts an end to the legal obligation and the relation of debtor and creditor. The statute does not go to the extent of requiring the laborer to pay the advances in labor, and, therefore, there is nothing to prevent his discharge of the debt for advances

in the same manner as other debts are discharged. It is equally clear that the service due by the laborer under the contract is also a debt within the meaning of the Constitution. Debt is that which is due from one person to another, whether money, goods or services, and whether payable at present or at a future time. Century Dictionary; 13 Cyc., 399, and authorities cited. The term "debt," within the meaning of the Constitution, is usually held to embrace obligations arising out of contract and to exclude liability for tort and for fines imposed for crime. *Carr* v. *State,* 34 L. R. A., 634, note; *State* v. *Brewer* (S. C.), 39 Am. St. Rep., 760.

Therefore, beyond dispute, the laborer referred to in the statute falls under the terms of the Constitution as a person who by his contract incurs a debt for advances received by him, and for labor which he promises to perform. For the mere failure to discharge these debts the Constitution forbids his imprisonment. If, however, the laborer contracts such a debt fraudulently, or fraudulently avoids the discharge of it, he falls without the protection of the Constitution.

The vital question then is, whether the statute contemplates conviction only for fraudulent breach of the contract—fraudulent failure to pay the debt of service. This inquiry depends upon whether one who shall "wilfully and without just cause fail to perform the reasonable service required of him by the terms of the said contract" is necessarily guilty of fraud, for if not, then a laborer may be convicted and imprisoned for debt under the statute without proof of fraud. It is not wilful nor intentional injustice the statute makes criminal, but wilful and unjust failure to carry out a contract. This distinction is vital. Clearly a laborer may wilfully refuse to perform the service required; his refusal may be unjust and the service required may be reasonable,—that is, such as he contracted to give,—and yet his action be free from fraud and taken with the utmost good faith, in the sincere belief that his refusal was just and

the service required unreasonable under the terms of the contract. Yet, however completely he may show his good faith, and however fully the Court and jury may be convinced of his good faith, conviction must follow unless the *jury think* he had just cause to abandon the contract or that the service required was not reasonable.

Wilful and unjust failure to perform a contract does not necessarily connote fraud. Bad faith is the test. One may wilfully or intentionally abandon a contract under a *bona fide* claim of right without being subject to the charge of fraud, though in fact the other party had not impaired his right to require performance. In addition to the abandonment being wilful, it may also be unjust without being fraudulent. Justice is rendering to every man his due. An act may be wilful and unjust ethically and legally and yet not fraudulent, because it may be done with such right intention as to completely negative the suggestion of actual fraud, and the grounds upon which the doer thought it right may be too rational for the law to impute fraud.

Obviously, the principle would be the same if the statute had provided imprisonment for a landlord who, having promised a laborer certain wages, and having the means, wilfully and unjustly refuses to pay him. No doubt fraud should be imputed where the debtor wilfully and unjustly refuses to pay any debt where he has the means to pay and the knowledge from the judgment of the Court, or otherwise, that there is a debt due and payment demanded. But injustice and fraud and unjust and fraudulent are far from being convertible terms. Fraud is corrupt injustice. No greater injustice has ever been suffered than that inflicted by men not only incapable of fraud, but who in the doing of their unjust acts were impelled by zeal for righteousness as they conceived it.

Whenever in a suit on a promissory note, or other contract, the Court gives judgment against a solvent debtor, this is an adjudication that the debtor wilfully and unjustly refused to pay that which the creditor reasonably demanded

of him.   Yet it would not be contended for a moment that
the wilful refusal to pay, which the Court adjudges to have
been an unjust refusal to comply with the creditor's reason-
able demand, must be fraudulent.   If so, every solvent liti-
gant who unsuccessfully defends a suit on a promissory
note, or for specific performance of a contract, would be
guilty of fraud, and a statute providing for his imprison-
ment would be constitutional.   We perceive no difference
between such a statute and the one now under consideration.
Such legislation can not be constitutional, because it contem-
plates imprisonment for a wilful and unjust refusal to per-
form the services contracted for, though such refusal be the
result of mistake of the laborer as to his legal rights, un-
tainted by fraud.   Had the General Assembly intended to
make proof of fraud necessary to the conviction of the
laborer under the statute, can it be doubted it would have
said so in plain terms by the use of the word "fraud," as it
has done in all other statutes providing for the punishment
of fraudulent practices?

It is strenuously argued, however, that the act does not
provide for imprisonment for debt under civil process, and
that the General Assembly may make an act criminal and
punishable by imprisonment which is not fraudulent nor
recognized as morally wrong.   The power of the General
Assembly to make an act criminal which was before inno-
cent is familiar.   But the legislative power to make acts
criminal and punishable by imprisonment cannot be extended
to an invasion of the rights guaranteed the citizen by the
Constitution.   It is impossible to frame a valid statute
punishing by imprisonment the exercise of the right to
religious liberty, or the right to petition for the redress of
grievances, or the right to be exempt from imprisonment for
debt except in a case of fraud.   These are all constitutional
rights which cannot be abridged under the guise of legisla-
tion against crime.   The exercise of them cannot be crime.

It is instructive to consider the extent to which other
courts have gone on this subject.   So far as our research

extends the only case holding unjust failure to pay a debt to be always fraudulent is *Ex parte Clark* (N. J.), 45 Am. Dec., 394. In that case a statute was held constitutional which provided for imprisonment for one who "unjustly and unlawfully" refused to apply his property to the payment of his debts. The decision rests upon what we have endeavored to show is a wholly unsound proposition of law, namely, that injustice and fraud is the same thing.

In *State* v. *Morgan* (N. C.), 14 S. E., 968, the statute under review made it a criminal offense for any person "with intent to cheat or defraud another" to obtain advances by color of any promise to commence work or labor and then "unlawfully and wilfully fail to commence and complete said work according to contract without a lawful excuse." The North Carolina Constitution provides "there shall be no imprisonment for debt except in cases of fraud." The courts sustained the validity of the statute on the express ground that it required proof that advances were obtained with intent to cheat and defraud.

In *Lamar* v. *State* (Ga.), 47 S. E., 958, on the same grounds the Supreme Court of Georgia held constitutional a statute which provided "that if any person shall contract with another to perform for him services of any kind, with intent to procure money or other thing of value thereby, and not perform the service contracted for, to the loss and damage of the hirer, or after having so contracted, shall procure money or other thing of value from the hirer, with intent not to perform the service, to the loss and damage of the hirer, he shall be deemed a common cheat and swindler, and shall be punished as for a misdemeanor." The statute was upheld solely upon the ground that it provided punishment for obtaining advances with a fraudulent purpose not to perform the service promised. To the same effect is *Banks* v. *State* (Ga.), 52 S. E., 74. It is true, in this last case the courts sustained that portion of the act which made the procuring of the advances and the failure to render the service or to return the money advanced without sufficient cause, to

2—79

the loss of the hirer, *prima facie* evidence of fraud—holding the provision to be merely establishing a rule of evidence. The *State* v. *Thomas* (Ala.), 113 Am. St., 17, is to the same effect as to the right of the Legislature to make similar action *prima facie* evidence of fraud. That point is not involved in this case because there is no such provision in our statute. But it is to be observed that the return of the advances would, under our statute, be no defense.

In *State* v. *Murray* (La.), 40 So., 930, a conviction was upheld under a statute which provided: "That whoever violates a contract of labor, upon the faith of which money or goods have been advanced, shall be punished by fine in the sum of not less than ten or over two hundred dollars, or, in default of payment, ninety days or less imprisonment, at the discretion of the District Court, unless the party had first tendered to the person with whom he entered into the labor contract and from whom the money or goods was obtained, the amount of money or the value of the goods obtained." It does not appear that the statute was assailed because providing imprisonment for debt. Indeed, such an objection could not have been made, because the Constitution of Louisiana contains no prohibition against imprisonment for debt. Such a statute would be invalid under the Constitution of this State because it provides imprisonment for debt for service and advances, without a word indicating that there should be proof of fraud. In fact, it allows no excuse whatever for failure to pay the debt. In *Toney* v. *State* (Ala.), 37 So., 332, an act very similar to ours was declared unconstitutional as depriving the citizen of the liberty of contract protected by the Constitution of the United States, the Court not considering whether the act provided imprisonment for debt.

The respondents urged that imprisonment for the failure to perform personal service has been sustained by the Supreme Court of the United States in the case of *Robertson* v. *Baldwin*, 165 U. S., 275. This is true; that case does hold constitutional an act of Congress authorizing punish-

ment by imprisonment of deserting sailors. But the Constitution of the United States contains no provision against imprisonment for debt. Section 990, Volume I, Federal Statutes 1901, requires the Federal Courts to conform to the laws of the several States in respect to imprisonment for debt, but inasmuch as sections 4598 and 4599, Volume III, expressly provide for imprisonment of deserting seamen, these last sections must be construed as providing exceptions to the general rule of conformity to State statutes on the subject of imprisonment for debt laid down in section 990. These sections are now repealed, but they were of force when *Robertson* v. *Baldwin* was decided. That case, therefore, is no authority for the proposition that seamen might be lawfully imprisoned for desertion under a State statute, notwithstanding a constitutional prohibition of imprisonment for debt except for fraud. We can find no case in this State or elsewhere sustaining the proposition.

On this reasoning we conclude the statute if given effect would take away the constitutional right of the citizen to be exempt from imprisonment for debt except in cases of fraud.

We next inquire whether the statute is invalid as an attempt to enforce involuntary servitude or peonage. The thirteenth amendment to the Constitution of the United States provides:

Section 1. "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction.

Section 2. "Congress shall have power to enforce this article by appropriate legislation."

In the enforcement of this amendment Congress enacted the following statute, now section 1990, Revised Statutes of 1901: "The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States; and all acts, laws,

resolutions, orders, regulations or usages of the Territory of New Mexico or any other Territory or State, which has heretofore established, maintained or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void."

This statute is thus interpreted in *Clyatt* v. *United States,* 197 U. S., 207, 215: "What is peonage? It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness. As said by Judge Benedict, delivering the opinion in *Jaremillo* v. *Romero,* 1 N. M., 190, 194: 'One fact existed universally; all were indebted to their masters, this was the cord by which they were seemed bound to their master's service. Upon this is based a condition of compulsory service. Peonage is sometimes classified as voluntary or involuntary, but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsory service, involuntary servitude. The peon can release himself therefrom, it is true, by the payment of the debt, but otherwise the service is enforced. *A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject like any other contractor to any action for damages for a breach of that contract, can elect at any time to break it and no law or force compels performance or a continuance of the service.* We need not stop to consider any possible limits or exceptional cases such as the service of a sailor (*Robertson* v. *Baldwin,* 165 U. S., 275) or the obligations of a child to its parents, or of an appren-

tice to his master, or the power of the Legislature to make unlawful and punish criminally an abandonment by an employee of his post of labor in extreme cases. That which is contemplated by the statute is compulsory service to secure the payment of a debt.' " The sentences we have italicized clearly indicate that such an enactment as this falls under the condemnation of the peonage statute.

It is not possible to bring contracts with agricultural laborers, such as that now under discussion, within the special cases referred to by Justice Brewer in this decision, for the statute was passed to enforce the thirteenth amendment to the United States Constitution, and the main purpose of that amendment was to prohibit any form of involuntary service by such laborers, especially negro laborers in the South. In this opinion the Court, further considering the peonage statute, says: "It is not open to doubt that Congress may enforce the thirteenth amendment by direct legislation, punishing the holding of a person in slavery or in involuntary servitude except as a punishment for crime. In the exercise of that power Congress has enacted these sections denouncing peonage and punishing one who holds another in that condition of involuntary servitude. This legislation is not limited to the territories or other parts of the strictly national domain, but is operative in the States and wherever the sovereignty of the United States extends."

It is important to observe our statute places no limit on the time for which a laborer may be bound under a contract to work, nor does it allow him to release himself from his burden to continue the service on pain of punishment as a criminal by repayment of the advances. The statute not only enforces the involuntary service of the laborer because he has contracted a debt with his employer, but it enforces his involuntary service because the debt once existed, though it be paid. Thus it falls within the prohibition of the peonage statute and goes beyond it. It is no answer to say the laborer originally entered into the contract of service and contracted the debt voluntarily. The peonage statute is

directed against maintaining as well as establishing involuntary servitude in liquidation of any debt or obligation. It is nothing in support of the statute now attacked that it enforces involuntary servitude on account of a debt by the compulsion of a statute providing for indictment and imprisonment for quitting such a service, rather than allowing the employer to compel it under a guard. In contemplation of law, the compulsion to such service by the fear of punishment under a criminal statute is more powerful than any guard which the employer could station.

Finally, we consider whether the statute is opposed to the fourteenth amendment to the Constitution of the United States and Section 5 of Article I of the Constitution of this State as denying to a farm laborer falling under it the equal protection of the laws. We incline to the opinion that a statute not admitting of this objection could be framed, making criminal and punishable by imprisonment a farm laborer's fraud in obtaining advances, and a landlord's fraud in contracting with a laborer, and that it would be no valid objection to such a statute that it did not apply to all persons or even to all laborers and employees.

The Supreme Court of the United States in *Connolly* v. *Pipe Co.*, 184 U. S., 540, 558, says: "What may be regarded as a denial of equal protection of the laws is a question not always easily determined, as the decisions of this Court and of the highest courts of the States will show. It is sometimes difficult to show that a State enactment having its source in a power not controverted, infringes rights protected by the National Constitution. No rule can be formulated that will cover every case. But upon this general question, we have said that the guarantee of the equal protection of the laws means 'that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances.'" The general rule is familiar that a statute affecting alike all persons of a class is constitutional if the classification be not arbitrary but based upon reasonable

grounds. It is thus stated in *Barbier* v. *Connolly*, 113 U. S., 27, 32 : "Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." The leading authorities on the subject are reviewed in *Johnson* v. *Spartan Mills,* 68 S. C., 339, 47 S. E., 695.

But this legislative discretion is thus limited in *Connolly* v. *Pipe Co., supra:* "In prescribing regulations for the conduct of trade, it cannot divide those engaged in trade into classes and make criminals of one class, if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of government and at the same time, indirectly, to build up or protect particular interests or industries. *It is quite a different thing for the State under its general police power to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce.* Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates." In view of the expressions we have italicized, the point is by no means free from difficulty, and there is strong reason to argue a valid statute could not be enacted making farm laborers and landlords liable to imprisonment for fraud in their contracts which did not make all other persons guilty of like fraud in their contracts, likewise criminally liable. This was the conclusion reached by Judge Brawley, United States District Judge, in considering the statute now before us (*Ex parte Drayton*, 153 Fed., 986) ; and it seems to be the view of Judge Jones of the Federal Court as expressed

in the discussion of a similar statute of the State of Alabama. Peonage Cases, 123 Fed., 686.

Whatever doubt there may be on this point, we should solve in favor of the legislative power of the State, on the ground that under the peculiar conditions of agricultural industry in the State, such classification of agricultural employers and laborers would not be arbitrary, but reasonable. The crop of a Southern planter is pitched early in the year, and constant attention to the end of the season is essential to prevent complete failure and disaster to the planter. On the other hand, the farm laborer, the other party to the contract, is usually improvident and more dependent upon his daily earnings than any other class. In every community all of the available labor is usually engaged for the crop season. The farmer makes large expenditures in preparation and in actual cultivation on the faith of the labor contract; and if those whom he engages act in bad faith, in leading him to depend on their labor and make advances to them, with no intention of rendering the services expected, much loss is incurred. So, also, if the dishonest landlord secures the labor of those he employes, with a fraudulent intent not to pay for their work, a special hardship results in deliberately bringing to want the peculiarly helpless. Hence, it seems not unreasonable for the General Assembly to guard against fraud and enforce honesty in such contracts by special sanctions.

But even if this statute provided punishment only for fraud in such contracts, it violates the fourteenth amendment to the Constitution of the United States, and Article I, Section 5, of the State Constitution, in that it does not bear equally on the landlord and the laborer. The parties to a contract are entitled to equal sanctions of the law for the protection and enforcement of their rights under it. Here the laborer is to be punished for his refusal to perform the service after receiving advances, while no punishment is provided for the landlord who may receive in advance the laborer's service and refuse to pay his wages.

In addition to this, there is a patent and arbitrary distinction made between laborers who stand upon precisely the same legal footing. The laborer who receives advances and refuses to perform the service contracted for is liable to indictment, and the statute makes no provision for him to save himself by the repayment of the advances; while the laborer who abandons his contract without having received advances does not fall under the statute. The laborer who receives advances in good faith and pays the debt cannot stand in a legal or moral attitude different from that of a laborer who has never received advances; and there is no ground to classify the former as a criminal for abandoning his contract while exempting the latter. Equal protection of the laws embraces the right to equal exemptions. Hence, when the laborer pays back the advances, and thus places himself upon an equal footing with the laborer who has received no advance, he is entitled to the same exemption from punishment.

We have not considered the amendment to the statute passed in 1904 (24 Stat., 428), which provides: "That a conviction of either party mentioned in Section 355 and Section 357 of the Criminal Code (Vol. II, Code of Laws, 1902), for violation of such contract as is mentioned in said sections, shall not operate as a release or discharge of such person from the performance of any part of said contract which is to be performed subsequent to the date of the breach for which such conviction was had: *Provided, however,* That such person shall not be criminally liable for the non-performance of any obligation due to be performed during the period of time such person may be undergoing imprisonment." The petition does not show that the petitioner has been twice convicted for abandonment of the service under one contract, and, therefore, the constitutionality of the amendment is not before us.

We conclude that the statute under which the defendant was convicted is invalid because opposed to Sec. 24, Art. I, of the Constitution of the State, to the thirteenth amend-

ment to the Constitution of the United States and the act of Congress passed in pursuance thereof known as the peonage statute, and to the fourteenth amendment of the Constitution of the United States and Sec. 5, Art. I, of the Constitution of this State.

It may be in the long run, the welfare of all the people and the development of the negro race in virtue and strength would have been better promoted by laws imposing upon the people of that race, on their emergence from slavery, a degree of restraint and discipline, under rigid laws for their protection. But that question is not for the Court. The constitutions of the United States and of this State, as they are, must control the courts; and the fundamental principle of these constitutions is that the welfare of all the people is promoted by the enjoyment of equal liberty by all alike, and that even if prosperity is not always promoted by constitutional guarantees, liberty is better than prosperity.

The judgment of this Court is, that the petitioner be discharged.

Mr. Chief Justice Pope *and* Circuit Judges Watts, Gage, Memminger *and* Gary *concur.*

Circuit Judge Dantzler *concurs in the result.*

Mr. Justice Gary *dissents, on the ground that the constitutionality of the statute is not properly before the Court under habeas corpus proceedings.*

Mr. Justice Jones, *dissenting.* The petitioner, Jack Holman, was convicted before a magistrate and sentenced to imprisonment for violation of Section 357 of the Criminal Code. He now makes application for his discharge under *habeas corpus* procedings, upon the ground that the statute is unconstitutional.

It is objected that the constitutionality of the statute can not be tested under *habeas corpus.* This question has not

been expressly decided in this State, but the latest practice has been to permit such question to be raised under said writ, and this accords with the general principle decided—that the jurisdiction of the Court may be considered under *habeas corpus.* The cases of *In re Stokes,* 5 S. C., 71; *Ex parte Bond,* 9 S. C., 80; *State v. Lundy,* 19 S. C., 601, decide that mere irregularities or errors of law committed by the trial Court in the rendition of a voidable judgment cannot be corrected under *habeas corpus,* but that the only remedy is by appeal. In *Ex parte Williams,* 32 S. C., 583, 10 S. E., 551, the Court refused to discharge a convict in the penitentiary under proceedings by *habeas corpus,* the grounds upon which the constitutionality of the statute was assailed being raised in an appeal then pending from the judgment. *State v. Williams,* 32 S. C., 124, 10 S. E., 933. When, however, the judgment is void and not merely voidable, relief may be had by *habeas corpus.* *Ex parte Bond,* 9 S. C., 80; *Ex parte De Hay,* 3 S. C., 564. Under *habeas corpus* this Court will inquire whether the conviction was by a court of competent jurisdiction. *State v. Garlington,* 56 S. C., 414, 34 S. E., 689. See, also, *State v. Higgins,* 51 S. C., 51, 28 S. E., 15, 38 L. R. A., 561. If the statute under which a conviction is had is null and void, as in conflict with the Constitution, the Court is without jurisdiction.

In *Ex parte Keeler,* 45 S. C., 537, 23 S. E., 865, 31 L. R. A., 678, this Court considered the constitutionality of the dispensary law under *habeas corpus* proceedings, following with approval the rule stated in *Andrews v. Swartz,* 156 U. S., 272, "that a prisoner under conviction and sentence of another court will not be discharged on *habeas corpus* unless the Court that passed the sentence was so far without jurisdiction that its proceedings must be regarded as void." Among other cases the Court cited *Ex parte Siebald,* 100 U. S., 371, 376, which is a strong case for the view that a conviction founded on a statute which violates the Constitution is void and imprisonment thereunder is illegal and

relievable on *habeas corpus*. In that case the Court said: "An unconstitutional law is void, and is no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment." This is now the prevailing view in the State Courts as well as the Federal Courts. 21 Cyc., 302; 15 Ency. Law, 2d ed., 204; Church. *Habeas Corpus,* 2d ed., 383; *Stoutenburgh* v. *Frasier* (District of Columbia), 48 L. R. A., 220; *Moore* v. *Wheeler* (Ga.), 35 S. E. Rep., 116; *Commonwealth* v. *Huntly* (Mass.), 30 N. E. Rep., 1128; *In re Wright* (Wy.), 31 Am. St. Rep., 103; *State* v. *McMahon* (Minn.), 38 L. R. A., 676; *Donnell* v. *State* (Miss.), 12 Am. Rep., 375; *Ex parte Rosenblatt* (Nev.), 3 Am. St. Rep., 901; *Ex parte Smith* (Mo.), 58 Am. St. Rep., 576, 33 L. R. A., 606; *People* v. *Durston* (N. Y.), 16 Am. St. Rep., 859. See, also, *Ex parte Mato,* 19 Tex. App., 112; *Ex parte Burnett,* 30 Ala., 461; *Ex parte Rollins,* 80 Va., 314; *Brown* v. *Duffus,* 66 Iowa, 193; *Ex parte Champ,* 9 Ohio, 672.

The writ was so used in Illinois in the case of *People* v. *Turner,* 8 Am. Rep., 645, but now under Revised Statutes, 1893, prescribing the cases in which the writ may be used, the Court declined to consider the constitutionality of a statute. *People* v. *Jones,* 50 N. E. Rep., 1051. In Indiana the rule is that judgment of conviction is not subject to attack on *habeas corpus* alleging the unconstitutionality of the statute unless a question under the Federal Constitution is raised, in which the courts of that State follow the rule in *Ex parte Siebold, supra: Koepke* v. *Hill,* 87 Am. St. Rep., 162. The last mentioned volume contains an elaborate note citing numerous cases on the subject. In Georgia it is stated that if the prisoner on his trial raised the question of invalidity of the statute under which he was convicted and this point is decided against him, it then becomes *res judicata* and cannot be reviewed collaterally on *habeas corpus.* *Griffin* v. *Eaves,* 39 S. E. Rep., 913. In the case

at bar the point was not raised on trial and the inquiry now involves a question under the Federal Constitution.

It becomes our duty, therefore, to consider the grounds upon which it is claimed that Section 357, Criminal Code, under which petitioner was convicted, is invalid. The statute reads:

"Any laborer working on shares of crop or for wages in money or other valuable consideration, under a verbal or written contract to labor on farm lands, who shall receive advances either in money or supplies and thereafter wilfully and without just cause fail to perform the reasonable service required of him by the terms of the said contract shall be liable to prosecution for a misdemeanor, and on conviction shall be punished by imprisonment for not less than twenty days nor more than thirty days, or to be fined in the sum of not less than twenty-five dollars, or more than one hundred dollars, in the discretion of the Court: *Provided,* The verbal contract herein referred to shall be witnessed by at least two disinterested witnesses."

The above act was further amended by Act No. 242 of Acts of 1904 (24 Stat., 428) by adding after Section 357 of the Criminal Code a section to be known as Section 357-a, which provides that a conviction of either party mentioned in Sections 355 and 357 for violation of the said contract "shall not operate as a release or discharge of such person from the performance of any part of said contract which is to be performed subsequent to the date of the breach for which such conviction was had."

Little notice need be given to the objection that the statute violates Art. I, Sec. 17, of the Constitution providing that no one should be subject for the same offense to be twice put in jeopardy of life or liberty. The case presents no question concerning a second jeopardy for the same offense. The effect of the amendment to Section 357 is in nowise involved. Even if this amendment should be regarded invalid, it is clearly separable from the original

statute and would not afford any ground for declaring a conviction under the original statute void.

It is claimed that the statute violates Art. I, Sec. 24, which declares that "no person shall be imprisoned for debt except in cases of fraud." This objection is met by consideration from either of two standpoints: (1.) If the statute be construed as providing imprisonment for debt the act made penal involves dishonesty and fraud. (2.) The statute does not provide imprisonment for debt. This provision of the Constitution implies that there may be imprisonment for debt in a case of fraud. It is dishonest and fraudulent to obtain advances in money or supplies on the faith of a contract for service and then wilfully and without just cause refuse to render the reasonable service required by the contract. In the case of *Ex parte Clark,* 45 Am. Dec., 394, 396, the Supreme Court of New Jersey held that a statute allowing imprisonment for debt where the debtor unjustly and unlawfuly refuses to apply property under his control to the payment of his debts did not violate a similar clause of the New Jersey Constitution. The Court says: "It is one of the most dishonest things a man can be guilty of, to refuse to pay his honest debts when he has the means to do so. Whatever is dishonest is fraudulent *in foro conscientiae* and is so treated in a court of equity. Fraud and dishonesty are synonymous terms. The true spirit of the Constitution is this (and it speaks the enlightened and benevolent language of the age in which we life) : the honest debtor, who is poor and has nothing to pay with, shall not be imprisoned at the mercy of the creditor. But if the debtor, instead of putting himself upon his honest poverty, seek to elude the jurisdiction and process of the courts; if he conceal, or assign, or remove his property to keep out of the reach of his creditors; or if he have the means in his pocket, or under his control, of paying his debt, and refuses to do so, he is a dishonest and fraudulent man." The Court further said: "Whether the fraud has relation to the time and manner of creating the debt, or to subsequent attempts

to defeat the creditor's recovery of it, can make no difference. It is left to the Legislature to say what shall be deemed such fraud as shall make a man liable to imprisonment; and how it shall be proved, in order to justify the arrest of the debtor. The statute, however, does not provide imprisonment for debt.

In the case of *State* v. *Chapman,* 56 S. C., 420, 421, 34 S. E., 961, this statute was construed and the Court said: "That the offense denounced is not merely the violation of a contract by a laborer employed to work the lands of another, but the offense consists in receiving advances either in money or supplies, and thereafter wilfully and without just cause failing to perform the reasonable service required of him by the terms of the contract. * * * The offense * * * would not be complete if the laborer, *before receiving advances in money or supplies,* had wilfully and without just cause failed to perform the reasonable service required of him by the terms of the contract, for the gist of the offense is in failing to do so *after* he has received advances in money or supplies made to him upon the faith that he would perform the reasonable services required of him by the terms of the contract."

In the case of *State* v. *Easterlin,* 61 S. C., 71, 39 S. E., 250, this Court expressly decided the point in question, holding that the statute does not violate Art. I, Sec. 24, of the Constitution. The Court, after referring to the construction of the statute in *State* v. *Chapman, supra,* said: "The statute as thus construed does not provide imprisonment for debt, but even if it could be so construed, the offense made punishable involves an element of fraud." See, also, *Lamar* v. *State* (Ga.), 47 S. E. Rep., 958, and *Banks* v. *State* (Ga.), 52 S. E. Rep., 74, 2 L. R. A. (N. S.), 1007, and *State* v. *Norman* (N. C.), 14 S. E. Rep., 968.

In *State* v. *Barden,* 64 S. C., 206; 41 S. E., 959, Section 377, Criminal Code, declaring it a misdemeanor to sell personal property under mortgage or lien without the consent of the mortgagee or lienee and failure to pay the debt

secured by the same within ten days after such sale or disposal, etc., was held not in violation of Art. I, Sec. 24.

There is no imprisonment under the statute in question except as a penalty for what involves moral fraud and which the Legislature has declared to be a criminal act, and it is well settled that the section of the Constitution under consideration has no application to criminal proceedings. *State* v. *Brewer*, 38 S. C., 263, 16 S. E., 1001, 19 L. R. A., 362; published also in 37 Am. St. Rep., 750, with annotations.    In so far as this question may be deemed to involve the power of the State to declare the conduct described in the statute criminal, it more properly belongs to questions hereinafter considered.

It is further contended that the statute violates Art. I, Sec. 5, of the State Constitution, which provides: "The privileges and immunities of citizens of this State and of the United States shall not be abridged, nor shall any person be deprived of life, liberty or property without due process of law, nor shall any person be denied the equal protection of the laws." In *State* v. *Chapman, supra,* the statute was assailed as in violation of Art. I, Sec. 5, as well as Art. I, Sec. 24, and the Court held that none of the grounds upon which the constitutionality of the act was assailed were tenable. As Section 5 of Article I above quoted is very similar in language to the fourteenth amendment of the Federal Constitution, its further consideration will be involved when we come to consider the objection based upon the fourteenth amendment.

We notice the next claim that the statute conflicts with the thirteenth amendment of the Federal Constitution, which provides:

Section 1. "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. "Congress shall have power to enforce this article by appropriate legislation."

Pursuant to the amendment Congress enacted what is known as the Peonage Statutes, Sections 1990 and 5526, Rev. Stat. U. S. Comp. Stat., 1901, pp. 1266, 3715. Section 1990 declares:

"The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States; and all acts, laws, resolutions, orders, regulations or usages of the Territory of New Mexico, or of any other Territory or State, which have heretofore established, maintained or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation or otherwise, are declared null and void."

Section 5526. "Every person who holds, arrests, returns or causes to be held, arrested or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be punished," etc.

In the case of *Clyatt* v. *United States,* 25 Sup. Ct. Rep., 429, the Supreme Court of the United States held that these statutes were within the provisions of the thirteenth amendment; that peonage under the statute may be defined as a *status* or condition of compulsory service based upon the indebtedness of the peon to the master, the basal fact being indebtedness.

But Section 1990, above quoted, in so far as it expresses the purpose of the thirteenth amendment, cannot have the effect to annul the State statute under consideration. The Federal statute denounces peonage; the State statute does not sanction peonage. The Supreme Court of Louisiana in the case of *State* v. *Murray,* 40 So. Rep., 930, said: "Under the peonage system, a laborer is absolutely bound to his employer. He is absolutely compelled to stay and labor until he has paid his indebtedness. If he attempts to leave, or leaves, he can be restrained or forced to return. The

employer can sell his unexpired term to any one who will pay the amount due and assume the obligations of the master." None of these incidents attach to the labor contract statute in question. The statute gives the master no dominion over the body or liberty of the servant. If the servant break his contract and leave, the master cannot coerce his return to employment. The contract is not assignable, and as a rule, with rare exceptions, is limited to the crop year ensuing. If the statute operates to prevent the laborer from violating its provisions, and so restrains him from a tortious and fraudulent breach of his duty under the specified conditions, such restraint results from the law and not from any attempt by the master to assert dominion over the liberty of the servant because of a mere contract of service.

Independent of the peonage statutes of Congress, however, the thirteenth amendment is self-executing and renders null and void any State legislation authorizing involuntary servitude except as a punishment for crime after due conviction. *Clyatt* v. *United States,* 25 Sup. Ct. Rep., 429.

Does the statute authorize involuntary servitude? The laborer has the utmost freedom to make or refuse to make farm labor contracts. No account of indebtedness to the landowner existing at the time of the contract can afford the slightest basis upon which the laborer may be coerced against his will into making such contract, nor is any such indebtedness within the contemplation of the statute. After the making of the contract, the laborer is not bound to obtain any advances in money or supplies from the landowner. He may, if he so wills, make his contract so that at the end of each day or week he may receive, not advances on the faith of labor to be performed but compensation for labor already performed, and thus provide for his necessities, or if he is willing and able to do so, he may secure such supplies as he needs from any other source. The statute cannot reach him if he refrains from inducing the landowner to make advances to him on the faith of his contract, even

though he break his contract and go to work elsewhere to supply his necessities. If his necessities and his inability to secure advances from any other source compel him to invoke the needed advances from the landowner, such invironment of his choice comes not from the statute, but from his lamentable situation which the law does not make and is powerless to unmake. If the laborer's poverty and poor credit elsewhere compel him to seek advances from the landowner after the contract to labor, he is fortunate in so far as the statute tends to induce the landowner to render assistance on the faith of the contract. As already stated, even after the advances are made by the landowner, if the laborer wilfully and without just cause breaks his contract and quits the service of the landowner there is no power under the statute to compel his return to service. His going into service, remaining in service, or returning to service after breach of contract is voluntary. The only involuntary servitude imposed by the statute is as punishment for what the statute declares to be a crime whereof the party has been duly convicted.

In the case of *State* v. *Williams*, 32 S. C., 124, 10 S. E., 876, the Court in considering Section 2084 of the General Statutes, a labor contract statute like the one under consideration (except in one particular which rendered it unconstitutional, but which was remedied by the present statute), held explicitly that such labor contract statute did not violate Art. I, secs. 1, 2 and 20 of the State Constitution of 1868, which were as follows:

Section 1. "All men are born free and equal; endowed by their Creator with certain inalienable rights; among which are the rights of enjoying and defending their lives and liberties, of acquiring, possessing and protecting property and of seeking and obtaining their safety and happiness.

Sec. 2. "Slavery shall never exist in this State; neither shall involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted."

Sec. 20. "No person shall be imprisoned for debt except in cases of fraud, etc."

The Court, speaking through that able, learned and just-minded jurist, Justice McIver, who afterward adorned this Court as its Chief Justice, said: "If the General Assembly sees proper to make the violation of a particular species of civil contracts a criminal offense, we are unable to discover in the provisions of the Constitution anything which forbids such legislation. No person is required to enter into such a contract unless he chooses to do so; and if he does so he must take the consequences affixed by the law to the violation of a contract into which he has voluntarily entered, just as he subjects himself to the consequences of any other violation of the law. We are unable to discover any feature of 'involuntary servitude' in the matter. Every one who undertakes to serve another in any capacity parts for a time with that absolute liberty which it is claimed that the Constitution secures to all; but as he does so voluntarily, it cannot be properly said that he is deprived of any of his constitutional rights; and if he violates his undertaking, he thereby of his own accord subjects himself to such punishment as the law-making power may have seen fit to impose for such violation." The generality of this language of course is to be construed in the light of the particular acts which the Legislature declared to be criminal, and if applicable to the statute then under consideration, it may well apply to the statute here involved as construed in *State* v. *Chapman* and *State* v. *Easterlin, supra.*

In the case of *State* v. *Murray,* 40 So. Rep., 930, 931, the Supreme Court of Louisiana sustained a statute of that State which provided that whoever violates a contract of labor, upon the faith of which money or goods have been advanced, shall be punished by fine, etc., unless the party had tendered the money or goods obtained. The Court held that the statute did not violate the thirteenth amendment, using in part this language: "If the question were before us of an attempt on the part of the employer, because of his

laborer's indebtedness, to compel him to continue to perform his daily task, the result would in all probability be different. But here no such question presents itself. There could not have been the least coercion by the master or employer to compel the continuance of the work. The laborer became the debtor wilfully in order to obtain a small amount without performing any labor whatever. The employer did not deprive him of his liberty, but he deprived his employer of his property. He went off with that which was not his and for which he did not labor, and now his contention is that the statute is unconstitutional and in its constitutionality does not reach even such an act of bad faith as that which he has committed. There can be no law which prohibits the condemnation of such acts. If no man has a right to keep another in involuntary servitude, no man by false words has the right to obtain property of another and keep it as his own."

In view of the foregoing considerations and in the absence of a controlling decision of the Supreme Court of the United States to the contrary, we are bound to hold that the statute is not obnoxious to the thirteenth amendment.

It is finally urged that the statute is in conflict with the fourteenth amendment of the Federal Constitution, which provides:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The clauses of this amendment somewhat overlap each other and a consideration of one involves more or less a consideration of the other. It is undoubtedly true that the "privileges and immunities" of a citizen as well as his "liberty" involve the right, not only to be free from physical restraint, but the right to follow any lawful business or avocation in life and to make all proper contracts in

furtherance thereof. *Butchers' Union Co.* v. *Crescent Co.,* 111 U. S., 757; *Allgeyer* v. *Louisiana,* 165 U. S., 578. It is equally true that labor is property and the right to contract for labor is a property right. The statute in no sense interferes with the laborer's right to pursue his calling. It does not obstruct his freedom of contract. So far as the statute affects these matters, it promotes the industrious pursuit of the laborer's calling and vitalizes his reasonable contracts to that end. Freedom and liberty in the pursuit of a calling and in making necessary contracts is one thing; license to break contracts and quit the pledged work tortiously and fraudulently after acquiring another's property on the faith of the contract is quite another thing. The general right of a laborer to contract with whom he will and to terminate such contract at will, subject to civil liability for breach, is conceded. But this general statement is subject to modification. Freedom of contract is not absolute and unlimited but is subject to modification. Freedom of contract is not absolute and unlimited but is subject to such restrictions as the Legislature may impose under the police power of the State. *Johnson* v. *Spartan Mills,* 68 S. C., 339, 47 S. E., 695; *Rose* v. *Harlee,* 69 S. C., 527, 48 S. E., 541.

In *Barbier* v. *Connolly,* 113 U. S., 27, the Supreme Court of the United States declared that the fourteenth amendment was not designed "to interfere with the power of the State, sometimes termed its police power, to prescribe the regulations to promote the health, peace, morals, education and good order of the people and to legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity." In *Wilkerson* v. *Rohrer,* 11 Sup. Ct. Rep., 865, 866, Chief Justice Fuller, speaking for the Court, declared: "The power of the State to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order and prosperity is a power originally and always belonging to the States, not surrendered to them by the general government nor directly restrained by the Consti-

tution of the United States and essentially exclusive." This, of course, does not mean that State legislation under the mere guise of police regulation can destroy a right secured by the Federal Constitution, but it means that legislation relating to a subject properly within the police power and reasonably designed to effectuate such public purpose does not infringe upon the fourteenth amendment. The fundamental inquiry then is whether the legislation is fairly within the police power of the State.

The statute is presumptively valid. Whoever seeks to overthrow it must show beyond a reasonable doubt that it violates some constitutional inhibition. The power of the State to create and punish public offenses is undoubted. There is high warrant for saying that the State may declare an act innocent in itself to be criminal. *People* v. *West,* (N. Y.), 12 N. E. Rep., 610; *Lawton* v. *Steele,* 14 Sup. Ct. Rep., 499, 503. In the last mentioned case the Court said: "The power of the Legislature to declare that which is perfectly innocent in itself to be unlawful is beyond question, and in such case the Legislature may annex to the prohibited act all the incidents of a criminal offense including the destruction of property denounced by it as a public nuisance." This, we suppose, is true when the act, though involving no moral turpitude in itself, may yet by its prevalence and tendency under peculiar circumstances injuriously affect the public. But the act declared to be criminal in the statute in question is not innocent in itself; it involves moral turpitude, it involves dishonesty and fraud as already pointed out, and the right of the Legislature to make such an act punishable as a crime will hardly admit of serious doubt. The statute is not unconstitutional because it fails to expressly make a fraudulent intent a necessary ingredient of the crime. *People* v. *West, supra.* The conduct denounced by the statute could, however, be seldom committed except with a fraudulent intent.

In *Lamar* v. *State* (Ga.), 47 S. E. Rep., 958, the Court, sustaining similar legislation, said: "If the Act prescribes

a punishment for a simple violation of a contractural obliga-
tion, it is beyond the power of the General Assembly. But
if its purpose is to punish for fraudulent and deceitful prac-
tices, it is valid even though the fraud and deceit may arise
from the failure to comply with a contractual engagement.
* * * The right of the law-making power to declare fraud-
ulent practices a crime does not seem to have ever been
seriously questioned."

The statute of Alabama which was pronounced uncon-
stitutional in *Toney* v. *State,* 141 Ala., 120, 109 Am. S.
Rep., 23, made it a misdemeanor for a laborer under con-
tract to work farm lands to break his contract and enter
into another contract with a different person without the
consent of his employer and without sufficient excuse and
without giving notice of the said contract to the person
with whom he makes the new one. The act was condemned
because of the restrictions it purports to place on the right
to make contracts for employment. The South Carolina
statute places no restriction on the right of the laborer to
make a similar contract of employment with another after
the breach of the former contract. It merely punishes for
a fraudulent breach of the first contract after obtaining
advances on the faith of it. The distinction is wide and
vital, as indicated by the Louisiana and Georgia cases
already cited. On the other hand, in *State* v. *Thomas,* 114
Ala., 77, 113 Am. St. Rep., 17, another Alabama statute,
not limited to farm labor contracts, but providing that a
failure or refusal of any person who has entered into the
contract of service and obtained any money or property
thereby to perform such service or refund such money or
property without just cause, shall be *prima facie* evidence
of an intent to defraud, was held to be constitutional. The
principle of this last-mentioned case supports the South
Carolina statute, unless the limitation of the legislation to
farm labor contracts is an unlawful discrimination, a matter
to be now considered.

Legislation is not unequal nor discriminatory in the sense of the equality clause of the Constitution, merely because it is special or limited to a particular class. The decisions of the United States Supreme Court establish that the Legislature has power to make a classification of persons or property for public purposes, provided such classification is not arbitrary and bears reasonable relation to the purpose to be effectuated, and that the equality clause is not violated when all within the designated class are treated alike, *Barbier* v. *Connolly*, 113 U. S., 27; *Soon Hing* v. *Crowley*, 113 U. S., 703, 709.

In the last-mentioned case the Court said: "The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions or are held entitled to different privileges under the same conditions." In *Railway Co*. v. *Mackey*, 127 U. S., 205, the Court sustained the constitutionality of a Kansas statute imposing upon railroad corporations future liability for damages to employees by negligence of their fellow-servants, notwithstanding no such liability existed against any other person or corporation, because the Court considered that the legislation met a particular necessity and all railroad corporations without distinction were made subject to this same liability. This case shows pointedly that a classification may be reasonable and yet not include all engaged in a general business, as the business of carrying freight and passengers, but may be limited to those who carry freight and passengers in a particular way, as railroads, to the exclusion of all other common carriers.

If such a classification is permissible, is not one which would place farm labor contracts in a class as distinct from other labor contracts also permissible? We are not unmindful of the rule that *quasi* public corporations, such as railroads, being the creatures of statute, may the more easily be subjected to certain statutory regulations, but such a consideration was not controlling in *Railway Co*. v.

*Mackey, supra,* for other corporate common carriers whose employees may be injured by the negligence of a fellow-servant, were not made subject to the regulations. So in *Erb, Receiver,* v. *Morasch,* 20 Sup. Ct. Rep., 820, it was held that an exception of a dummy railroad operated by steam, or an electric railroad, in an ordinance limiting the speed of railroad trains within the city, does not make an unreasonable classification in denial of the equal protection of the laws. Responding to the suggestion that there was testimony that the operation of the street railroad was in fact more dangerous than operation of the railroad in the hands of plaintiff receiver, the Court said: "It is not a question to be settled by the opinion of witnesses and the verdict of a jury upon the question whether one railroad in its operation is more dangerous than another. All that is necessary to uphold the ordinance is that there is a difference, and that existing, it is for the city council to determine whether separate regulations shall be applied to the two. * * * Given the fact of a difference, it is part of the legislative power to determine what difference there shall be in the prescribed legislation."

In *Missouri, etc., R. R. Co.* v. *May,* 24 Sup. Ct. Rep., 638, the Court sustained a Texas statute imposing a penalty in favor of contiguous landowners against railway companies for permitting Johnson grass or Russian thistle to mature and go to seed upon their road, although no such penalty was imposed against others who might communicate the seeds of such plants to the railroad right of way, nor against other carriers, nor as between contiguous landowners. The Court answered all such suggestions by saying: "When a State Legislature has declared that, in its opinion, policy requires a certain measure, its action should not be disturbed by the courts under the fourteenth amendment, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. * * * Great constitutional provisions must be administered with caution.

Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

If the purpose of the statute has been construed by the State Court to be merely to compel the payment of indebtedness, there would be good ground for holding it an unreasonable classification to make the regulation apply to only one class of debtors. *Gulf, etc., Ry.* v. *Ellis,* 165 U. S., 157; 17 Sup. Ct. Rep., 257. But, as has been shown, such is not the purpose of the statute, and it is usual under the principle of comity for the Federal Courts to accept the settled construction placed upon a statute by the State Court, except in matters of commercial law and general jurisprudence. So that the Federal question presented is whether the statute as construed by the State Court violates the Federal Constitution.

In the case of *Connolly* v. *Union Sewer Pipe Co.,* 22 Sup. Ct. Rep., 431, the Court declared that the Illinois trust act violated the fourteenth amendment in exempting agricultural products and live stock in the hands of the producer or raiser from its provisions. Under that statute, all, except the producers of the agricultural commodities and raisers of live stock, who combined their capital, skill or acts for any of the purposes named in the act to destroy competition and control prices, could be punished as criminals, while agriculturists and live-stock raisers in respect of their products or live stock in hand, were exempted from the operation of the statute and might combine and do that which, if done by others, would be a crime against the State. It is not hard to see that this would be an unreasonable classification and exemption in a statute designed to prevent and punish combinations in restraint of trade in agricultural products and live stock as well as other commodities. In view of the purpose of the statute, the mere distinction between agricultural products and live stock in the hands of the producer or raiser and the same articles of a domestic

trade open to all in the hands of the purchaser from the producer or raiser, seems arbitrary. Our statute is clearly distinguishable from the statute considered in the Connolly case. While the right to make contracts for farm labor is open to all, the right to secure advances on the faith of such contracts and then wilfully and without cause refuse to restore the property in the manner required by the reasonable terms of the contract is not a right open to all; indeed, it is lawfully open to none. Such conduct violates the maxim of the common and civil law that one must so use his own as not to injure another. It involves a wilful trespass upon the rights of another. It may be penalized by punitive damages in a civil remedy, or if the Legislature should deem such redress utterly futile and see fit to punish it criminally, we see no constitutional restraint upon such action.

In *Halter* v. *Nebraska*, 27 Sup. Ct. Rep., 419, the Court held that it was lawful for the State of Nebraska to declare it a misdemeanor to use representations of the national flag upon articles of merchandise for advertising purposes, notwithstanding an exception was made in favor of newspapers, periodicals, books, pamphlets, etc., on which should be printed representations of the national flag disconnected from any advertisement. In distinguishing the Halter case from the Connolly case, the Court stressed the fact that in the Connolly case domestic trade in agricultural products and live stock was "open to all, subject to such regulations applicable alike to all in like conditions as the State may legally prescribe," whereas in the Halter case it was considered that no one had the right to use the country's flag merely for advertising purposes.

In *Holden* v. *Hardy*, 18 Sup. Ct. Rep., 385, the United States Supreme Court sustained a statute of Utah forbidding under penalty the employment of workingmen for more than eight hours per day in mines and in the smelting, reduction, refining of ore and metal; in *Commonwealth* v. *Hamilton Mfg. Co.*, 120 Mass., 383, the Massachusetts

Supreme Court sustained a statute prohibiting the employ-
ment of women in any manufacturing establishment for
more than sixty hours per week; and in *People* v. *Havnor*,
43 N. E. Rep., 541, the New York Supreme Court sus-
tained a statute making it a misdemeanor for a barber to
carry on his business on Sunday but excepting from its
operation the keeping open of barber shops in New York
City and Saratoga Springs on that day up to 1 o'clock
P. M. Many other illustrations might be given to show
that it is not essential to valid police regulations concern-
ing labor contracts that they must apply to all laborers, but
that the regulations may apply only to a more restricted
class of laborers. "The question in each case," says the
Court in *Holden* v. *Hardy, supra,* "is whether the Legisla-
ture has adopted the statute in the exercise of a reasonable
discretion or whether its action be a mere excuse for an un-
just discrimination, or the oppression or spoliation of a par-
ticular class."

South Carolina is essentially an agricultural State. Upon
this industry the public welfare depends more largely than
upon any other. While every business and industry needs
assurance of a steady supply of labor for its successful
prosecution, this need presses more keenly upon the agri-
culturist than upon any other because of distinct and
peculiar conditions. With industries conducted generally
in populous centers and within doors, the all-year employ-
ment, the seemingly more remunerative wages, the brief
and regular intervals of wage payment, the social and school
advantages, the more comfortable surroundings, possibly
tend to induce for them a more steady and reliable supply
of laborers. While it is quite probable that advances may
to some extent be made to such laborers and also that some
of them may break contracts and quit employment without
cause after such advances, yet it cannot be affirmed beyond
a reasonable doubt that the Legislature had no ground for
supposing that the regulation in question should apply to
farm contracts only, as a remedy for an evil peculiarly

affecting the agricultural industry.   A prevailing custom
between landowner and laborer is to enter into farm labor
contracts near the beginning of the year.   The landowner,
isolated upon his farm, as a prudent man wants to
know what labor he may count upon in the production of
the crops that year so as to make his arrangements accord-
ingly.   He must adjust his operations with the seasons and
the uncertain elements.   The loss resulting from the failure
of a single day's work at critical times can seldom be recov-
ered.

Usually when the contract is made the severe winter is
on.   The laborer is supplied with a house and has privilege
of taking firewood, these generally without charge, but
work is slack then upon the farm and the laborer and his
family often need food and clothing, which he has not
earned and for which he cannot pay the cash.   Then he
generally secures advances from the landowner on the faith
of his contract.

A very prevalent form of labor contract is the share sys-
tem, in which the landowner furnishes land, stock, tools,
seed and fetilizers in whole or in part, and the laborer un-
dertakes to supply all the necessary labor, for which he is
to receive an agreed portion, frequently one-half, of the
crop.   Or the contract may be for stipulated wages in
money payable at the end of the month or year or at such
time as may be agreed upon.   When the busy work-time on
the farm arrives, the laborer is generally in debt to the land-
owner for advances secured on the faith that he will perform
the stipulated work.   It is then the dishonest laborer repudi-
ates his obligation, and not only fraudulently deprives the
owner of his property but frequently brings disaster on the
landowner's farming business.   The frequency of such con-
duct and its evil influence on the farming industry called
for some remedy.   The utter futility of mere civil remedies
against the average farm laborer and the necessity for some
remedy no doubt prompted the act in question.   We think
the legislation lies fairly within the discretion of the Legis-

lature under the police power; and that it is not a violation of the fourteenth amendment becauses it penalizes certain conduct of farm laborers as distinguished from other laborers.

Nor is it discriminating because it does not also provide punishment for the landowner. It punishes alike all who may be guilty of the offense described, and if the landowner is not included it is because in the nature of things he could not be guilty of the specific conduct declared to be criminal. The fact that the landowner may do some wrong to the laborer equally deserving of punishment should the Legislature see fit to make it penal, is not at all relevant to the question as to the power of the Legislature to make the certain conduct of the laborer criminal. *State* v. *Chapman,* 56 S. C., 420, 34 S. E., 961.

For these reasons I dissent from the opinion of the majority of the Court.

CIRCUIT JUDGES KLUGH, PRINCE *and* HYDRICK *concur in this opinion.*