10378

SHAW v. FISHER.

(102 S. E. 325.)

1. CONSTITUTIONAL LAW—HOLDING ONE HIRING SERVANT WHO HAS BROKEN CONTRACT OF EMPLOYMENT LIABLE TO THE MASTER WOULD CREATE INVOLUNTARY SERVITUDE.—As Const. U. S. Amends. 13 and 14, abolished all involuntary servitude except for crime, one who hires a servant who has already broken his contract of service with knowledge of the breach is not responsible to the master despite the common law holding to that effect, for, if any one who engaged a servant breaking his contract of employment would be liable to the master, the servant would practically be compelled to remain in the service until the expiration of his contract and thus reduced to a state of involuntary servitude.

2. MASTER AND SERVANT—ENGAGING SERVANT QUITTING SERVICE OF ANOTHER LAWFUL.—The law does not prevent a servant who breaks his contract securing other employment by penalizing those who engage him with notice.

3. CONSTITUTIONAL LAW—LAW COMPELLING EMPLOYER TO RETAIN ONE IN SERVICE WOULD DENY RIGHT TO ACQUIRE AND HOLD PROPERTY.—Any law which would undertake to compel an employer to retain in his service an employee whom he desires to dismiss would be a denial of the employer's constitutional right to make contracts and acquire and hold property, even though the contract of service had not expired.

Before SHIPP, J., Anderson, Spring term, 1919. Reversed.

Action by John L. Shaw against A. D. Fisher. From a judgment for plaintiff, defendant appeals.

*Mr. A. H. Dagnall,* for appellant, submits: *The servant had terminated the contract on his own volition, without any enticement or persuasion on the part of appellant, and there can be no liability on the part of the person hirina such laborer:* 105 S. C. 38; Constitution of the United States, Amendment 13, sec. 1; U. S. Revised Stats., secctions 1990 and 5526, known as the Peonage Acts; 79 S. C. 22. *The statute governing registration of labor contracts does not*

*apply to a suit for damages:* Vol II, Criminal Code 1912, sections 492 and 498, inclusive.  *It was error for the Court to instruct the foreman of the jury, in effect, that the jury must stay in the jury room until they had found a verdict:* 38 Cyc. 1856; 106 S. C. 153.

    *Messrs. Bonham, Watkins & Allen,* for respondent, submit: *The relation of master and servant exists in this State as at common law:* 6 S. C. 297-301; 6 S. C. 304; 15 S. C. 87; 18 S. C. 513; 94 S. C. 309; 34 S. C. 311.  *A person who wrongfully interrupts the relation between master and servant by procuring the servant to depart from the master's service, whereby the master is injured, commits a wrongful act for which he is responsible at law:* Labatt's Master and Servant, vol. VII, p. 8017.  *The exceptions charging a violation of section 1 of the 13th Amendment to the Constitution of the United States, and sections 1990 and 5526 of the Revised Statutes of the United States have no application to this case.  The questions were not made below, nor decided by the Court below.  The Thirteenth Amendment conferred freedom upon the slave; sections 1990 and 5526, Revised States U. S., were enacted to break the system of peonage which prevailed in some sections.  As to the question of the coercion of the jury by the Judge:* 16 L. R. A., Old Series 643; 105 S. C. 243.

    February 23, 1920.

    The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

    Plaintiff sued defendant for damages (1) for enticing away from him one Carver, who was under contract with him as a share cropper for the year 1916, and (2) for harboring his said servant by employing him after notice that he was under contract with plaintiff.  The jury found a general verdict for plaintiff for $300, and from the judgment thereon defendant appealed.

Plaintiff's contract with Carver was in writing, dated March 22, 1916, and provided that Carver should work for plaintiff as a share cropper until the end of the year. Carver left plaintiff in June, and moved into a house on defendant's plantation. His goods were moved by the use of defendant's wagon and team, against plaintiff's protests and notice to defendant that Carver was under contract with him. After he left plaintiff, Carver worked for wages, part of the time for defendant, and part of the time for others in the community.

Defendant denied enticing Carver away from plaintiff, and introduced testimony tending to prove that Carver quit plaintiff's service of his own volition and for cause. Carver so testified, and said that plaintiff was so contentious and hard to get along with that he would "die and go to hell" rather than to have worked for him any longer; and that he quit plaintiff, of his own motion, before he applied to defendant for employment.

Defendant asked the Court to instruct the jury that, if Carver quit plaintiff of his own volition, they should find for defendant; and the Court gave that instruction, but restricted the application of it to the cause of action for enticement, and charged the jury that, if Carver quit plaintiff for good cause, that is, such cause as would be sufficient in law to justify him in breaking his contract with plaintiff, defendant would not be liable for employing him, but if Carver broke his contract with plaintiff without such cause, and if defendant gave him employment after notice that he was under contract with plaintiff, defendant would be liable on the cause of action for harboring plaintiff's servant.

The Court read to the jury as law the following from section 2596, vol. VII, Labatt's Master and Servant:

"It must now be considered clear law that a person who wrongfully and maliciously, or which is the same thing, with notice, interrupts the relation subsisting between master and servant by procuring the servant to depart from the

master's service, or by harboring and keeping him as a servant after he has quitted it, and during the time stipulated for as the period of service, whereby the master is injured, commits a wrongful act for which he is responsible at law."

Defendant concedes that the law as to enticing another's servant was correctly laid down, but assigns error in the charge as to liability of one who merely employs a servant after notice that he has quit the service of another, even though the quitting was an unwarranted breach of contract.

The issue is one of grave concern, both to employers and employees, and we have given it consideration commensurate with its importance.

No doubt the law declared to the jury was at one time the common law of England, and we will assume that it was also the common law in this country prior to the adoption of the thirteenth and fourteenth amendments to the Federal Constitution But those amendments superseded and annulled all law—statutory or common law—which was in conflict with them. And we think the law as declared to the jury in this case as to the liability of one for harboring the servant of another does conflict with the spirit and intent of both those amendments.

1-3

The thirteenth amendment prohibits involuntary servitude, except as a punishment for crime.

"It was a charter of universal civil freedom for all persons, of whatever race, color, or estate, under the flag. * * * The plain intention was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit which is the essence of involuntary servitude." *Bailey v. Alabama,* 219 U. S. 219, 241, 31 Sup. Ct. 145, 151 (55 L. Ed. 191).

The Court further said: "While the amendment was self-executing, so far as its terms were applicable to any existing

condition, Congress was authorized to secure its complete enforcement by appropriate legislation."

And, in interpreting the act of Congress commonly known as the peonage statute, which was enacted to give effect to the thirteenth amendment, after quoting the provisions of the statute, the Court said at page 242 of 219 U S., at page 152 of 31 Sup. Ct. (55 L. Ed. 191) :

"And in this explicit and comprehensive enactment, Congress was not concerned with mere names or manner of description, or with a particular place or section of the country. It was concerned *with a fact,* wherever it might exist; *with a condition,* however named and wherever it might be established, maintained, or enforced (and, we may add, however it might be brought about). The fact that the debtor contracted to perform the labor which is sought to be compelled does not withdraw the attempted enforcement from the condemnation of the statute. The full intent of the constitutional provision could be defeated with obvious facility if, through the guise of contracts under which advances had been made, debtors could be held to compulsory service. *It is the compulsion of the service that the statute inhibits, for when that occurs the condition of servitude is created,* which would be not less involuntary because of the original agreement to work out the indebtedness. *The contract exposes the debtor to liability for the loss due to the breach, but not to enforced labor."* (Italics added.)

In *Clyatt v. United States,* 197 U. S. 207, 215, 25 Sup. Ct. 429, 430 (49 L. Ed. 726), after stating the difference between so-called voluntary and involuntary peonage, the Court said: "But peonage, however created, is compulsory service, involuntary servitude." The converse must be true—that involuntary servitude, however created or brought about, is within the inhibition of the statute, if the purpose of it is to enforce the payment of a debt, or the

performance of the obligation of a contract. And, again, at page 215 of 197 U. S., at page 430 of 25 Sup. Ct. (49 L. Ed. 726) :

"A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject like any other contractor to an action for damages for breach of that contract, *can elect at any time to break it, and no law or force compels performance or a continuance of the service.*" (Italics added.)

Of course, as there said, this statement of the law is not applicable to exceptional cases such as the service of a sailor, the obligations of a child to its parents, and other exceptional relations, which need not be mentioned.

Let us apply the principles above stated to the situation before us. If no one else could have employed Carver during the term of his contract with plaintiff, after he had elected to break that contract, without incurring liability to plaintiff for damages, the result would have been to coerce him to perform the labor required by the contract; for he had to work or starve. The compulsion would have been scarcely less effectual than if it had been induced by the fear of punishment under a criminal statute for breach of his contract, which was condemned, as violative of the thirteenth amendment, in *Ex parte Hollman,* 79 S. C. 9, 60 S. E. 19, 21 L. R. A. (N. S.) 242, 14 Ann. Cas. 1105. The prohibition is as effective against indirect as it is against direct actions and laws—statutes or decisions—which, in operation and effect, produce the condition prohibited. The validity of the law is determined by its operation and effect.

Of course, the sanction of the obligation of the contract, and the liability to pay damages for breach thereof, inhere in every contract, and these alone do not amount to that compulsion which is prohibited so long as the employee has the liberty at any time to elect to break the contract, subject

only to the legal consequences—an action for damages—just like any other contractor.   But if the law should penalize all who give him employment, after he has breached his contract, the effect would be to deny to him the same freedom that every other contractor enjoys, to wit, that of electing at any time to break his contract, subject only to his liability for damages. .  To that extent, liberty of action and freedom of contract is guaranteed by the fourteenth amendment.   *Coppage v. Kansas,* 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. 441, L. R. A. 1915c, 960; *Truax v. Raich,* 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916d; 545, Ann. Cas. 1917b, 283.

The law under the Federal Constitution, as interpreted by the highest Courts, is thus stated in 6 R. C. L., at page 274:

"Liberty of contract involves, as one of its essential attributes, the right to terminate contracts, subject only to civil liability for unwarranted termination.   Since an employee cannot be compelled to work against his will, it is generally recognized that he is at liberty to refuse to continue to serve his employer.   In this respect the rights of the employer and the employees are equal.   Any act of the legislature that would undertake to impose on an employer the obligation of keeping one in his service whom, for any reason, he does not desire, would be a denial of his constitutional right to make and terminate contracts and to acquire and hold property.   Equally so would be an act the provisions of which were intended to require one to remain in the service of another whom he did not desire to serve.   Accordingly, it has been held that a statute making it a misdemeanor for one under contract to labor or work on particular land to break his contract and enter into another with a different person, without the consent of his employer, and sufficient excuse, to be adjudged by the Court, and without giving notice of his contract to the person with whom he makes the new one, violates the constitutional guarantees of liberty."

See, also, 16 R. C. L., p. 414, and 18 R. C. L., p. 510, and authorities cited in the footnotes.

If Carver, of his own volition and without enticement from defendant, put an end to his contract with plaintiff, as we have seen he had the constitutional right to do, with or without cause, subject only to liability for damages for an unwarranted breach, he had the right thereafter to contract with defendant, or any other person, for his labor, and those who gave him employment are under no legal liability to plaintiff. Their right to hire him is determined by his right to hire to them. *Truax v. Raich, supra.*

In this view of the case, it becomes unnecessary to consider the error assigned in the charge as to the measure of damages resulting from the harboring of Carver. The other exceptions are overruled.

. As the jury may have found that defendant did not entice Carver away from plaintiff, but that he was liable for hiring him after notice that he was under contract with plaintiff and after he had breached that contract of his own volition, there must be a new trial.

Judgment reversed.

MESSRS. JUSTICE WATTS and FRASER concur.

MR. CHIEF JUSTICE GARY did not sit.

MR. JUSTICE GAGE. I dissent. The argument of the leading opinion would be relevant were the procedure against the servant; but it is not.

The effect of the decision will be to deprive the first employer of a laborer of all remedy against the second employer of a laborer, for in every instance the second employer will surely make his contract after the servant has broken his contract.

It will be time enough to announce that the case is controlled by Federal law when so much has been decided by Federal Courts, which I conceive has not yet been done.